Appeal No. 22-55663

# IN THE
# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Anthony Sanders, et al.,
Plaintiffs - Appellants,

v.

County of Ventura,
Defendant - Appellee.

On Appeal from the United States District Court for the Central District of
California
District Court Case No.:  2:19-CV-06370-MWF-E
The Honorable Michael W. Fitzgerald

## APPELLEE'S ANSWERING BRIEF

BRIAN P. WALTER, #171429
PAUL D. KNOTHE, #254011
LIEBERT CASSIDY WHITMORE
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045
Telephone:  310.981.2000
Facsimile:   310.337.0837
Attorneys for Appellee/Defendant
County of Ventura

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................1

II. STATEMENT OF JURISDICTION ......................................................3

III. STATEMENT OF THE RELEVANT FACTS ......................................3

    A. THE COUNTY'S FLEXIBLE BENEFITS PROGRAM ...................3

    B. EMPLOYEES CHOOSE WHETHER TO PARTICIPATE IN THE FLEXIBLE BENEFITS PROGRAM .................................................3

    C. PROGRAM PARTICIPANTS CAN CHOOSE TO PURCHASE BENEFITS WITH THEIR FLEX CREDIT OR OPT OUT AND RECEIVE CASH ..................................................................................5

    D. THE OPT-OUT FEE IS USED TO PROVIDE MEDICAL INSURANCE TO EMPLOYEES .......................................................6

        1. The Development of the Opt-Out Fee ........................................6

        2. Annual Determination of the Amount of the Opt-Out Fee.........9

        3. Use of the Opt-Out Fee to Manage Medical Benefit Costs........9

            a. Transfer to Insurers or Unions..........................................9

            b. The Administrative Fee ...................................................10

            c. The Employee Health Services Fee................................12

    E. EMPLOYEES REPRESENTED BY THE SHERIFFS AND FIRE UNIONS ........................................................................................12

        1. Deputy Sheriffs' Association ...................................................12

        2. Professional Firefighters' Association......................................13

    F. THE INCIDENTAL CASH PAYOUT ..............................................13

    G. CALCULATION OF THE REGULAR RATE OF PAY ..................15

10293367.6 VE306-011

H.    THE COUNTY'S PAY STUBS ........................................16

IV.   SUMMARY OF THE ARGUMENT ............................................16

V.   STANDARD OF REVIEW ...........................................................18

VI.   ARGUMENT...............................................................................18

A.   BECAUSE THE COUNTY'S FLEXIBLE BENEFITS PROGRAM IS BONA FIDE, NON-CASH CONTRIBUTIONS TO THE PLAN ARE PROPERLY EXCLUDED FROM THE FLSA REGULAR RATE OF PAY ..............................................................................18

1.   The District Court Was Correct That the Bona Fide Status of the Flexible Benefits Program is Dispositive ............................18

2.   The Flexible Benefits Plan is Bona Fide ..................................19

a.   The Plan is Bona Fide Under the Plain Meaning of the Language of the Act .......................................................19

b.   The Department of Labor's Interpretive Guidance Supports a Conclusion the Plan is Bona Fide.................21

c.   This Court is Not Bound by the DOL's Interpretive Guidance ..........................................................................22

d.   Because Section 778.215(a)(1) is Not a Regulation, DOL's "Final Rule" Interpreting it is Not Entitled to *Auer* Deference ...............................................................24

e.   Appellants' Calculation of the Amount Paid in Cash is Based on a False Assumption .........................................24

3.   The Bona Fide Status of the Plan Must Be Determined on a Plan-Wide Basis.......................................................................26

4.   Contributions to the Plan for the Purchase of Medical Insurance are not Cash Under *Flores* .......................................................27

B.   APPELLANTS' ARGUMENTS PREMISED ON THE OPT-OUT FEE BEING CONSIDERED A WAGE ARE MISTAKEN ..............28

1.   Appellants' reliance on the County's pay stubs is misplaced ..28

1.      Since The Opt-Out Fee Is Not A Wage, It Cannot Be an
        Unlawful Kick-Back of Wages ................................................29

2.      DOL Guidance on Deductions From Stipulated Wages Is Not
        Relevant to the Opt-Out Fee From a Flexible Benefits
        Program. .....................................................................................30

3.      The Opt-Out Fee, Like Participation in the Flexible Benefits
        Program Altogether, is Voluntary .............................................31

VII.    CONCLUSION ...............................................................................32

10293367.6 VE306-011

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Auer v. Robbins*
  519 U.S. 452 (1997) ............................................................24

*Bowles v. Seminole Rock & Sand. Co.*
  325 U.S. 410 (1945) ...........................................................24

*Cadena v. Customer Connexx* LLC
  51 F.4th 831 (9th Cir. 2022)...............................................18

*Christensen v. Harris County*
  529 U.S. 576 (2000) ...........................................................22

*Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*
  458 F.3d 931 (9th Cir. 2006)...............................................20

*Encino Motorcars, LLC v. Navarro*
  138 S. Ct. 1134 (2018) .......................................................22

*Flores v. City of San Gabriel*
  824 F.3d 890 (9th Cir. 2016)............................................ 16, 21, 22, 26

*Goffney v. Becerra*
  995 F.3d 737 (9th Cir. 2021)...............................................24

*Gordon v. Virtumundo, Inc*.
  575 F.3d 1040 (9th Cir. 2009)............................................18

*In re Redondo Beach FLSA Litigation*
  Case No.2:17-CV-09097-ODW (SKx), 2019 WL 6310264................................21

*Kisor v. Wilkie*
  139 S.Ct. 2400  (2019). ......................................................24

*Lake Wash. Sch. Dist*.,
  947 F.3d at 621 (9th Cir. 2020) ..........................................18

*Madison v. Res. For Human Dev.*
    233 F.3d 175 (3d Cir. 2000). .................................................................22

*Riley's Am. Heritage Farms v. Elsasser*
    32 F.4th 707 (9th Cir. 2022) .................................................................18

*Rubin v. Wal-Mart Stores*
    599 F. Supp.2d 1176 (2009) .................................................................29

*Satterfield v. Simon & Schuster, Inc.*
    569 F.3d 946 (9th Cir.2009) .................................................................20

*Skidmore v. Swift & Co.*
    323 U.S. 134 (1944) .................................................................22

*Social Technologies LLC v. Apple, Inc.*
    4 F.4th 811  (9th Cir. 2021) .................................................................20

*Wallis v. Princess Cruises, Inc*.
    306 F.3d 827 (9th Cir. 2002) .................................................................18

**Federal Statutes**

29 U.S.C section 207(e)(4) .................................................................19

29 U.S.C. section 207(e) .................................................................19

**State Regulations**

29 C.F.R. section 531.32(a) .................................................................30

29 C.F.R. section 531.35.................................................................29

29 C.F.R. section 531.37(b) .................................................................30

29 C.F.R. section 778.215.................................................................21

29 C.F.R. section 778.215(a)(3)(ii).................................................................27

29 C.F.R. section 778.215(a)(5).................................................................22

## I.  __INTRODUCTION__

Appellee County of Ventura ("County") offers its employees a voluntary "Flexible Benefits Program" that allows employees who enroll to select medical, vision, and/or dental benefits using an allowance known as the "Flex Benefit Allowance," or, colloquially, the "Flex Credit."  The Flex Credit is not tied to salary or hours worked.  Employees who do not use their entire Flex Credit to obtain benefits can receive the remainder of the Flex Credit in cash.

In addition, employees can choose to participate in the Flexible Benefits Program, and then "opt out" of using the Flex Credit for benefits, and only receive a cash payment in lieu of the benefits ("cash-in-lieu").  To determine the cash-in-lieu amount, the County calculates an "opt-out fee" to apply to the amount of the Flex Credit that ensures the amount of the Plan's benefits that are paid to employees in cash remains at an incidental level.  The opt-out fee is used to provide medical insurance and similar benefits to County employees.  All cash-in-lieu is included in that employee's regular rate of pay for the purpose of calculating overtime under the Fair Labor Standards Act ("FLSA" or "Act"), consistent with *Flores v. City of San Gabriel*, 824 F.3d 890 (9th Cir. 2016).

Appellants assert they are owed FLSA overtime because in addition to the cash-in-lieu, the entire value of their Flex Credit should be included in the regular rate of pay for those employees who choose to participate in the Flexible Benefits Program, then opt out of benefits.  As the District Court correctly held, since the Flexible Benefits Program is a bona fide plan for the provision of medical and similar benefits to the County's employees, the Flex Credit is properly excluded from employees' regular rate of pay, except for any cash payout.

Appellants' single cause of action for unpaid overtime rises or falls with the determination of whether the Flexible Benefits Program is bona fide, as the District Court noted.  If the Program is bona fide, the Flex Credit, less the cash paid to

employees, is expressly excluded from the employees' regular rate of pay. Appellants argue, in mistaken reliance on misinterpretations of two sections of the Department of Labor's interpretive guidance, that even if the Program is bona fide, they are owed FLSA overtime, because the opt-out fee is a "kick-back" of wages paid. To support this argument, Appellants take the County's pay stubs out of context. While medical benefits are not treated as wages under the Fair Labor Standards Act, they are treated as gross income under the Internal Revenue Code ("IRC"). The County's pay stubs, in accordance with the IRC, list the full value of the Flex Credit as gross income, and the opt-out fee as a deduction. It is not surprising that the pay stubs would track the IRC rather than the FLSA; the FLSA does not even require a pay stub. The Flex Credit is at all times an employee benefit, not a wage, and under the FLSA, it is not part of the regular rate of pay or included in FLSA overtime calculations.

Further, if Appellants' position were to prevail, it could begin a "death spiral" and threaten the viability of the Flexible Benefits Program. The vast majority of the opt-out fee is transferred to insurance companies, or, in the case of employees represented by the Deputy Sheriffs' and Firefighters' unions, to their unions to defray the costs of medical benefits for those plan participants who opt in. The ability to spike overtime pay by inclusion of the full Flex Credit in their regular rate of pay would incentivize more employees to opt out of medical benefits. Actuarial assumptions indicate these additional employees who would opt out to spike their overtime pay would be healthier than the employee population generally. The loss of these employees from the risk pool would drive up the cost of insurance for the employees remaining in the plan. As the cost of the plan rises, more employees would opt out due to the rising costs, which would in turn drive up the cost still further.

The District Court was correct: the Flexible Benefits Program is a bona fide plan for the provision of medical and similar benefits, and that finding is dispositive of Appellants' claims. This Court should therefore affirm the judgment of the District Court.

## II. STATEMENT OF JURISDICTION

Appellee agrees with Appellant's statement of subject matter jurisdiction of the district court, the basis for claiming that the judgment or order appealed from is final, and the date of the order, the date of filing of the notice of appeal, and that statute under which it is claimed the appeal is timely.

## III. STATEMENT OF THE RELEVANT FACTS

### A. THE COUNTY'S FLEXIBLE BENEFITS PROGRAM

Pursuant to Internal Revenue Code Section 125, the County sponsors a cafeteria plan by which employees may, using their "Flex Credit," pay for certain qualified medical expenses, such as health insurance premiums, on a pre-tax basis. (2-ER-133 at ¶ 3.) The County's Flexible Benefits Program is available to all full-time County employees and to part-time County employees who have a schedule of at least 40 hours per biweekly pay period. (2-ER-124-125 at ¶ 4.; 3-ER-309 at 23:23-25.)

### B. EMPLOYEES CHOOSE WHETHER TO PARTICIPATE IN THE FLEXIBLE BENEFITS PROGRAM

Employees are not required to enroll in the Flexible Benefits Program: as stated in the County's Benefit Plans Handbook, "Participation is optional. You decide whether to participate or waive your right to enrollment and the Flexible Credit Allowance." (5-ER-963; 2-ER-124-125 at ¶ 4.)

The Benefit Plans Handbook further states, "[t]here may be a reason, such as a religious principle, that you wish to decline medical coverage altogether. Unlike the Medical Plan Opt-Out option, you will not have to show proof that you have

medical coverage elsewhere, but you **forfeit Flexible Benefits Program participation and you will not receive any Flexible Credits[.]**" (5-ER-966; 4-ER-695; 2-ER-125 at ¶¶ 6-7.)  (Emphasis in original.)

Within the 31-day enrollment period for the Program, employees are required to enroll on a website or submit a paper form.  (2-ER-125 at ¶¶ 8-9; 2-ER-135-161; 2-ER-163-174.)  Below the check boxes allowing employees to choose a medical plan (or opt out of medical coverage), dental plan, vision plan, Flexible Spending Account, and/or Health Savings Account, is a blue box containing the following text:

> ***WAIVER OF PARTICIPATION IN THE FLEXIBLE BENEFITS PROGRAM (NOT THE SAME AS OPTING OUT OF MEDICAL COVERAGE; DO NOT SIGN IF YOU WISH TO OPT OUT)***
>
> If you are eligible to participate in the Flexible Benefits Program, but DO NOT WANT TO ENROLL, read this WAIVER OF BENEFITS and sign and date where indicated:
>
> WAIVER OF BENEFITS: I have been informed about the County's Flexible Benefits Program.  I understand that, if eligible, I am entitled to a Flexible Credit Allowance each pay period if I am enrolled in the Ventura County Flexible Benefits Program.  I choose not to enroll and thereby waive and forfeit the County Flexible Credit Allowance.  I understand this decision is binding and that I will not have another opportunity to enroll until next annual Flexible Benefits Program open enrollment period.

(Id.)  (Emphasis in original.)  Under this warning is a signature line, which bears its own warning: "Signature (***DO NOT SIGN HERE IF YOU ARE ELECTING A PLAN OR OPTING OUT OF MEDICAL COVERAGE.  THIS IS FOR WAIVERS ONLY***.)"  (Id.)  (Emphasis in original.)  Since 2015, fifty-two employees have chosen to waive participation in the Flexible Benefits Program and entirely forego the Flex Credit allowance.  (2-ER-126-127 at ¶ 11.)

Employees are given a period of 31 days after they become eligible to participate (usually the date of hire) in which to enroll in the Flexible Benefits Program.  (5-ER-975; 2-ER-125 at ¶ 5.)  If employees do not enroll within this 31

day period, they are automatically enrolled in the lowest-cost plan for which they are eligible.  (5-ER-975; 2-ER-125 at ¶ 6.)  Employees are warned that if they fail to make their plan election, "[y]ou will lose your opportunity to opt-out of County medical coverage, which may have given you additional cash back in your pay." (5-ER-975; 4-ER-695 2-ER-125 at ¶¶ 6-7.)

## C. PROGRAM PARTICIPANTS CAN CHOOSE TO PURCHASE BENEFITS WITH THEIR FLEX CREDIT OR OPT OUT AND RECEIVE CASH

For each year from 2015 through 2021, between 8,572 and 9,433 County employees participated in the Flexible Benefits Program.  (5-ER-926 at ¶ 5.) When an employee enrolls in the flexible benefits program, the County provides the employee with a flexible credit allowance, known as the "Flex Credit", to spend on the employee's choice of medical, vision, and dental insurance and for flexible spending accounts. (6-ER-1118 at 21:12-18, 6-ER-1164 at 37:1-7; 5-ER-925 at ¶ 4.)  In setting the amount of the Flex Credit, the County targets an amount that will allow 70 to 80% of insurance premiums to be covered by the Flex Credit. (6-ER-1189-1190 at 31:4-32-21; 5-ER-915 at ¶ 10.) The County also utilizes comparator data from agencies such as the counties of Santa Barbara, Los Angeles, and San Diego in determining the amount of the Flex Credit.  (Id.)

The employee can choose to take portions of the Flex Credit allowance as deferred compensation for tax advantages.  (6-ER-1120 at 23:15-22; 5-ER-915 at ¶ 12.) The County does not provide employees with the option of receiving the full value of the Flex Credit as cash.  (5-ER-915-916 at ¶ 13; 5-ER-944-961; 5-ER-981-985; 5-ER-987-988.) The amount of the Flex Credit is unrelated to an employee's wages. The County has an "informal policy" that health benefits should be easily accessible and affordable regardless of the position an individual

is employed in.  (Id.)  The amount of the Flex Credit is calculated without regard to title, duties, or rate of pay. (Id.)

The amount of the Flex Credit allowance made available by the County to employees who are members of the Deputy Sheriffs' Association ("DSA") is negotiated with the DSA and set forth in the memorandum of agreement between the DSA and the County.  (5-ER-919 at ¶ 25; SER200-SER288; 6-ER-1146 at 84:6-12.)  Likewise, the amount of the Flex Credit allowance made available by the County to employees who are members of the Ventura County Professional Firefighters' Association ("PFA") is negotiated with the PFA and set forth in the memorandum of agreement between the PFA and the Ventura County Fire Protection District.  (5-ER-920 at ¶ 31, SER289-SER417.)

If the employee's benefit choices cost less than the Flexible Credit Allowance, the employee receives the unused portion of the Allowance in cash, less an opt-out fee.  (6-ER-1120-1121 at 22:15-23:1; 6-ER-1164 at 37:8-11; 5-ER-915-916 at ¶¶ 11, 13.)  Cash payments made to employees who choose to "opt out" of the County's Flexible Benefits Program are included in the employee's regular rate of pay for FLSA purposes.[1]  (5-ER-937 at ¶ 3; 6-ER-1163 at 36:16-25 6-ER-1165 at 59:12-24.)

#### D.     THE OPT-OUT FEE IS USED TO PROVIDE MEDICAL INSURANCE TO EMPLOYEES

##### 1.     The Development of the Opt-Out Fee

---

[1] Page 9 of the District Court's ruling states that "the cash-in-lieu payments were properly exempted", which is incorrect to the extent it suggests that cash payments were not included in opt-out employees' FLSA regular rate of pay.  No party disputes that such payments are included in the County's formula for calculating the FLSA regular rate of pay.

Until 1992, all County employees were required to participate in a County-sponsored medical plan or entirely forfeit their Flexible Benefits Program credit allowance. (6-ER-1124 at 31:14-20; 5-ER-916 at ¶ 14; 5-ER-981-985; 5-ER-987-988.) In 1991 and 1992, a Joint Labor-Management Healthcare Committee ("Committee"), comprising representatives from the County and employee unions, developed a plan for employees to keep their flexible benefit allowance in cash if they opt out of the County medical plan instead of losing it. (5-ER-916 at ¶ 14; 5-ER-981-985; 5-ER-987-988.)

The Committee determined it would calculate the cash payout to employees who chose to opt out of the County medical plan in a manner that retained more of the funds allocated to the Flex Credit to be used for the benefit of other County employees who remain in the plan; although the County describes it as a "fee" for ease of understanding, this amount is never given to an employee or charged back. (6-ER-1127 at 34:12-23; 6-ER-1164 at 37:12-21; 5-ER-944-961; 5-ER-981-985; 5-ER-987-988.) The Committee relied on assumptions provided by an actuary in setting the amount of the opt-out fee. (6-ER-1126 at 33:8-11; 5-ER-916-917 at ¶¶ 15, 17; 5-ER-981-985; 5-ER-987-988.) In setting the amount of the opt-out fee, the actuary identified the assumption that 20% of health plan participants generate 80% of the claims. (6-ER-1126 at 33:8-11; 5-ER-916 at ¶ 15; 5-ER-981-985; 5-ER-987-988.) The second actuarial assumption relied upon in setting the amount of the opt-out fee was that, in a large group, 85% of the amount spent goes toward medical claims and 15% goes to the insurance company for administrative costs and stop-loss insurance. (6-ER-1126-1127 at 33:23-34:3; 5-ER-916 at ¶ 15; 5-ER-981-985; 5-ER-987-988.) The third and final actuarial assumption relied upon in setting the amount of the opt-out fee was that a person who opted out of the health insurance was likely to be healthy. (6-ER-1127 at 34:4-8; 5-ER-917 at ¶ 16; 5-ER-981-985; 5-ER-987-988.)

The critical function of the opt-out fee is to offset the effect that employees who opt out have on the rates charged to employees who enroll in County plans, because the opt-out employees shrink the risk pool, which increases the cost of insurance for those employees enrolling in County plans. (6-ER-1127-1128 at 34:24-35:4; 6-ER-1129 at 36:14-18; 6-ER-1148 at 89:13-16; 5-ER-917 at ¶ 17; 5-ER-981-985; 5-ER-987-988.)

The rates provided to the County by the carrier assume participation from the entire risk pool; if some employees do not participate in the risk pool, and the risk pool becomes smaller, the risk is spread among a smaller group of people, which has the effect of increasing rates. Further, because employees who expect higher medical expenses tend to opt-in and stay in the risk pool, this smaller group is less healthy than the employee population as a whole. (6-ER-1125-1126 at 32:14-33:7; 5-ER-916, 918 at ¶¶ 14, 21; 5-ER-981-985.)

The County's Benefits staff is guided by the knowledge that when employees opt out and shrink the risk pool, this can create a vicious cycle where the resulting rise in premiums for employees to stay in the plan can cause more employees to opt-out, jeopardizing the County's ability to offer any plan at all to its employees as their health insurance premiums keep rising. The County Benefits staff refers to this effect as the "death spiral." (5-ER-917 at ¶ 18.)

Further, an employee who opts out of the County (or union) medical plan does not necessarily lower the Flexible Benefits Program's administrative costs. (6-ER-1147 at 87:3-25.) An employee who opts out of the County (or union) medical plan may still be enrolled in a County (or union) vision or dental plan. (Id.) There are administrative costs generated by opting out of the County (or union) medical plan such as verifications that the employee is actually on another insurance plan. (Id.) For employees who are not members of the Deputy Sheriffs Association (DSA) or Professional Firefighters Association (PFA), this opt-out fee

is used to offset the cost of the County-offered plans.  (6-ER-1131 at 38:17-21; 5-ER-918 at ¶ 21.)

This opt-out fee is deducted from the Flex Credit and the County then provides the balance as cash back to the employee for any amount that is not applied to other cafeteria plan options (dental or vision insurance or flexible spending account options).  (5-ER-915-916 at ¶ 13.)

### 2. Annual Determination of the Amount of the Opt-Out Fee

The amount of the opt-out fee is calculated on a County-wide basis without regard to what bargaining unit any particular employee belongs to.  (6-ER-1149 at 92:17-19; 5-ER-918 at ¶ 20.)  County staff submits an annual letter to the Board of Supervisors setting out all of the Flexible Benefits Program plan options, and the amount of the opt-out fees, for approval.  (6-ER-1141-1142 at 72:17-73:15.)   The County uses a rate model to determine the opt-out fee for a given plan year, which includes the assumptions that the top 20% of claimants account for 80% of total claims; that the top 20% of claimants do not waive coverage; and that 20% of total claims thus come from the remaining 80% of employees.  (5-ER-926 at ¶ 6; 5-ER-1093-1094; 5-ER-981-985; 5-ER-987-988; SER165-SER188; SER189-SER192; 5-ER-1046.)

For example, the opt-out fee for 2018 was $258.73 per pay period.  (5-ER-918-920 at ¶¶ 22, 28, 29; SER193-SER198; 2-ER-132-133.)

### 3. Use of the Opt-Out Fee to Manage Medical Benefit Costs

#### a. Transfer to Insurers or Unions

The vast majority of the opt-out fee is transferred to the insurers or unions and used to control the costs of health insurance for County employees who opt into their available health insurance plans.  For employees who are not members of the Deputy Sheriffs Association (DSA) or Professional Firefighters Association

(PFA), this opt-out fee is used to offset the cost of the County-offered plans.[2] (6-ER-1131; 5-ER-918 at ¶ 21.) For the exemplar year of 2018, $244.33 of the $258.73 opt-out fee was transmitted to insurance carriers (or to unions to transmit to insurance carriers) to offset the cost of health insurance for employees who opted in. (5-ER-918-920 at ¶¶ 22, 28, 29, 2-ER-132-133.) The remainder of the opt-out fee is used to cover other costs related to provision of health benefits to County employees, including DSA and PFA members.

### b. The Administrative Fee

The opt-out fee also includes a biweekly $14 "administrative fee" that is placed in the Medical Insurance Internal Service Fund (ISF) to cover the expenses of running the flexible benefits program. (6-ER-1134-1135 at 61:24-62:6.) The same administrative fee is paid by all employees, including DSA and PFA members. (6-ER-1135 at 62:3-11; 6-ER-1136-1137 at 65:10-66:12.)

The administrative fee component of the opt-out fee also directly funds the County's Wellness Program, the WorkLife Program, and the Employee Assistance Program (EAP), which are available free of charge to all participants in the Flexible Benefits Program, including those who opt out of medical insurance. (6-ER-1150 at 94:5-14; 5-ER-918-919 at ¶¶ 23-24; SER193-SER198.)

The EAP provides confidential and professional mental health assessment, treatment, referral recommendations to employees and eligible family members. The EAP includes up to five visits with a licensed counselor with extensive clinical experience in assessing, developing solution options, and offering resources for a wide range of issues such as personal crises, stressful experiences, marriage or family related problems, substance abuse, or challenges at work. The EAP also provides confidential referrals to outside providers if the employee needs further

---

[2] See Section III.E, below, for a discussion relating to members of DSA and PFA.

assistance beyond five sessions.  (5-ER-914-915 at ¶ 8; 5-ER-964-971; SER80-SER162.)

The Wellness Program is intended to help employees and their families lead a healthier and higher quality of life; it is also designed to help control increases in medical costs by helping participants identify and reduce their personal health risks before serious health problems occur.  (Id.)  All regular County employees are eligible to participate in all parts of the Wellness Program, and spouses are eligible to participate in some parts.  (5-ER-913-914 at ¶ 6; SER80-SER162.)  The Wellness Program includes access to an annual Wellness Profile, which allows employees and their spouses to evaluate their cholesterol, glucose, blood pressure, and other risk factors.  (5-ER-913-914 at ¶ 6; 5-ER-963-970; SER80-SER162.) Participants are provided an extensive results report, and if risks are identified, the opportunity to meet with a personal Health Coach free of charge.  (Id.)  The Wellness Program also provides classes on topics such as nutrition, fitness, diabetes, weight loss, stress management, and parenting.  (Id.)

The WorkLife Program provides employees with resources and information to assist with family caregiving.  (5-ER-914 at ¶ 7.)  This program provides a monthly support group for employees caring for elderly family members, discounts on online parenting resources and over 70 child care/preschool programs, and assistance for working mothers in pumping breast milk at the worksite.  (Id.)

The remainder of the administrative fee is applied to the costs of administering the Flexible Benefits Program.  (5-ER-919 at ¶ 23d.; SER193-SER198.)  The fact that an employee opts out of the County (or union) medical plan does not necessarily lower the Flexible Benefits Program's administrative costs.  (6-ER-1147 at 87:3-25.)  In addition to the benefits described above, the employee opting out of medical insurance may still be enrolled in a County or union vision or dental plan.  (Id.)  Further, there are administrative costs generated

- 11 -

by opting out itself, such as verifications that the employee is actually on another insurance plan. (Id.) This cost goes to necessities for administration of the plan such as facilities and staff. (6-ER-1147 at 87:3-25.)

### c. The Employee Health Services Fee

Every participant in the Flex Benefit Program, whether they enroll in County sponsored health insurance, union-sponsored health insurance, or choose to opt out, is charged a small "Employee Health Services Fee" or "EHS fee" from their Flex Credit to fund the County's on-site employee health clinic. For the year of 2018, the EHS fee was $0.43. (5-ER-919-920 at ¶ 28; 5-ER-1060; SER193-SER198; 6-ER-1121-1122 at 27:16-28:2; 6-ER-1123 at 29:6-18.)

### E. EMPLOYEES REPRESENTED BY THE SHERIFFS AND FIRE UNIONS

#### 1. Deputy Sheriffs' Association

Pursuant to the collectively bargained contract between the County and the Deputy Sheriffs' Association ("DSA"), employees who are DSA members are eligible to enroll in DSA-sponsored plans instead of the County-sponsored plans. (6-ER-1130 at 37:4-9; 6-ER-1188 at 21:6-9; 6-ER-1191-1192 at 35:12-36:4; SER200-SER288; 5-ER-1062-1089.)

DSA members who participate in the Flexible Benefits Program and choose to opt out of medical benefits pay the same opt-out fee as all other County employees. (6-ER-1131 at 38:8-11; 5-ER-919-920 at ¶ 28.) The opt-out fees paid by DSA members are paid to the DSA and used to offset the cost of the DSA-sponsored plans for those DSA members who enroll, and not to the Medical Internal Service Fund ("ISF") to offset costs for other County employees. (6-ER-1132-1133 at 45:19-46:9; 6-ER-1137-1138 at 66:25-67:16; 6-ER-1139 at 69:17-21.)

The DSA collects a biweekly "Admin Fee" and "Consulting Fee" from the DSA members' opt-out fees. (5-ER-919-920 at ¶ 28; 5-ER-944-961.) The remainder of the DSA members' opt-out fees is used to offset the increase in the premiums that would be paid by other DSA members that is caused by members who opt out of health insurance, which shrinks the risk pool. (6-ER-1140 at 71:4-13.)

### 2. Professional Firefighters' Association

The PFA offers multiple, tiered health insurance plans to its members. (6-ER-1193 at 49:19-25; 5-ER-920-921 at ¶ 32; 5-ER-1093-1094; 6-ER-1098-1103.) PFA members who have other coverage may choose to opt out a PFA-sponsored medical plan and pay the same opt-out fee as other County employees. (6-ER-1193-1194 at 49:19-50:12; 5-ER-921 at ¶ 33; 6-ER-1131 at 38:8-16.)

The amount of the Flex Credit allowance made available by the County to employees who are members of the Ventura County Professional Firefighters' Association ("PFA") is negotiated with the PFA and set forth in the memorandum of agreement ("MOA") between the PFA and the Ventura County Fire Protection District. (6-ER-1194 at 50:8-15; 5-ER-920 at ¶ 31; 6-ER-1144-1145 at 82:15-83:1; 6-ER-1146 at 84:6-12.)

The PFA collects a biweekly "Admin Fee" from the opt-out fees paid by PFA members. (5-ER-934 at ¶ 7; 6-ER-1098-1103.) The remainder of the opt-out fee transmitted to the PFA is used to offset the increase in premiums that would be paid by other PFA members that is caused by members who opt out of health insurance. (6-ER-1132-1133 at 45:19-46:9; 5-ER-926 at ¶ 10; 5-ER-934 at ¶ 7; 6-ER-1098-1103.)

### F. THE INCIDENTAL CASH PAYOUT

An employee who has opted out of County- or union-sponsored health insurance receives the remainder of the Flex Credit after the opt-out fee

(comprising both the health insurance offset and the de minimis "administrative fee") in cash. In addition, employees can opt in to the County-sponsored or union-sponsored medical insurance without spending the full Flex Credit, which results in those employees receiving some cash. (5-ER-921-922 at ¶ 41; SER289-SER417.) On a County-wide basis, less than 10% of the amount allocated to the Flexible Benefits Program is paid out to employees in cash. (5-ER-921 at ¶¶ 35-40; 5-ER-929 at ¶ 25.)

| Plan Year | Total allocated to Flexible Benefits Program | Total Paid Out in Cash | Percentage paid out in cash |
|-----------|---------------------------------------------|------------------------|-----------------------------|
| 2015 | $58,526,80.25 | $2,515,289.69 | 4.30% |
| 2016 | $62,706,209.54 | $2,584,317.15 | 4.12% |
| 2017 | $69,134,788.11 | $2,892,803.07 | 4.18% |
| 2018 | $77,832,074.90 | $3,569,927.23 | 4.59% |
| 2019 | $88,607,405.15 | $6,671,560.70 | 7.53% |
| 2020 | $97,909,367.50 | $7,564,134.02 | 7.73% |
| 2021 | $112,389,732.00 | $9,395,104.96 | 8.36% |

(5-ER-921 at ¶¶ 35-40; 5-ER-929 ¶ 25.)

For employees who are members of the PFA, the amount paid out in cash has risen in recent years, but remains well below 15%. (5-ER-928-929 at ¶¶ 18-24.)

| Plan Year | Total allocated to PFA members Flexible Benefits Program | Percentage used to purchase medical insurance | Percentage used toward opt-out fees | Percentage paid out to employees in cash | Number of PFA members opting out |
|-----------|--------------------------------------------------------|----------------------------------------------|-------------------------------------|------------------------------------------|----------------------------------|
| 2015 | $2,709,652.28 | 85.65% | 11.13% | 2.7% | 65 |
| 2016 | $2,894,407.14 | 78.87% | 10.77% | 9.13% | 63 |
| 2017 | $2,823,521.70 | 84.43% | 11.37% | 2.82% | 61 |
| 2018 | $3,093,410.37 | 83.58% | 11.20% | 2.77% | 66 |
| 2019 | $3,742,423.45 | 81.03% | 9.12% | 8.12% | 51 |
| 2020 | $4,380,840.53 | 78.76% | 7.99% | 11.12% | 50 |
| 2021 | $4,977,748.52 | 80.04% | 8.22% | 13.74% | 57 |

Even if the inquiry is limited to Flexible Benefits Program participants for DSA, the amount paid out in cash has risen in recent years, but remains well below 20%. (5-ER-926-927 at ¶¶ 11-17.)

| Plan Year | Total allocated to DSA members Flexible Benefits Program | Percentage used to purchase medical insurance | Percentage used toward opt-out fees | Percentage paid out in cash | Number of DSA members opting out |
|---|---|---|---|---|---|
| 2015 | $5,182,986.31 | 81.65% | 13.58% | 3.73% | 149 |
| 2016 | $5,377,778.94 | 81.13% | 14.64% | 3.43% | 160 |
| 2017 | $5,266,413.65 | 79.79% | 17.42% | 2.18% | 171 |
| 2018 | $5,873,750.57 | 79.14% | 17.18% | 3.02% | 183 |
| 2019 | $6,831,443.12 | 70.20% | 8.83% | 18.47% | 97 |
| 2020 | $7,802,453.67 | 73.69% | 5.55% | 18.55% | 69 |
| 2021 | $8,400,728.41 | 85.74% | 5.73% | 19.15% | 64 |

The percentage of the overall allocation to the Flex Benefit Program that has been paid out in cash to employees has risen, although it is still below 20%, for two major reasons: First, the DSA and PFA have negotiated for larger Flex Credits to be provided to employees, but the opt-out fee has remained approximately the same, meaning that employees in those two bargaining units who choose to opt out of health insurance now take home more cash. Second, the County has shifted from a super-composite rate for employee medical insurance, in which every employee pays the same premium regardless of the number of covered people in the employee's family, to a three-tiered rate, in which single employees and smaller families pay less. (5-ER-921-922 at ¶ 41.)

## G. CALCULATION OF THE REGULAR RATE OF PAY

The numerator in the County's formula for calculating the FLSA regular rate of pay for its employees is the total remuneration for all hours worked, including incentives and the cash benefit portion of the Flexible Credit Allowance ("Flex Credit") paid to the employee in the work period. This excludes pay for non-work

- 15 -

hours such as vacation, holiday and sick hours. (5-ER-937 at ¶ 5.) The denominator in the County's formula for calculating the FLSA regular rate of pay is the total number of hours worked by the employee in the work period. (*Id.*) To get the FLSA regular rate of pay for its employees, the County divides the numerator by the denominator. (*Id.*) For all employees, whether they are members of DSA, PFA, or neither, the cash-out amount is included in the employees' FLSA regular rate of pay. (5-ER-937 at ¶ 3; 6-ER-1163 at 36:16-25, 6-ER-1165 at 59:12-24.)

### H. THE COUNTY'S PAY STUBS

It is the County's practice to list all forms of remuneration that are considered "gross income" by the Internal Revenue Code in the "earnings" section of employee pay stubs. (2-ER-130 at ¶ 4.) This includes paid vacation, uniform allowances, additional pay for working on holidays, "floating holidays", and contract overtime that goes above and beyond the overtime required by the FLSA. (2-ER-130, 4-ER-625-627.)

## IV. <u>SUMMARY OF THE ARGUMENT</u>

Appellants argue that they are owed overtime because only the cash they receive when opting out of medical coverage from the County's Flexible Benefits Program is included in their regular rate of pay rather than the full amount of the "Flex Credit" they were allotted for the purchase of benefits. The District Court correctly held that Appellants are not owed any overtime, because contributions to the Flexible Benefits Program are within an express exclusion from the regular rate of pay under the FLSA.

Contributions made to the benefits plan are properly excluded from the regular rate of pay so long as the plan is "bona fide," meaning the plan is truly for the purpose of providing benefits to employees. (See 29 U.S.C. § 207(e)(4).) This Circuit's decision in *Flores v. City of San Gabriel* 824 F.3d 890 (9th Cir. 2016)

established that the amounts paid to third parties for the provision of benefits are excluded from the regular rate of pay unless the plan is not bona fide. There is no dispute that the genuine purpose of the Flexible Benefits Program is to provide benefits to employee. *Flores* found the City of San Gabriel's plan was not bona fide because over 40% of the money contributed by the city to the plan was paid out in cash to employees, instead of being used to purchase benefits, and this cash payment of more than 40% was not "incidental." Here, the amount paid out in cash is less than a quarter of the amount in *Flores*, and even where the numbers are willfully distorted, the amount paid in cash scarcely reaches half the amount that the *Flores* court found was not incidental. The District Court correctly held in this case that the Flexible Benefit Program is bona fide, which was the end of the inquiry.

Because the Flexible Benefits Program is bona fide, contributions to the plan fall into a specific exclusion under the Act and are not included in the regular rate of pay. These contributions are therefore not part of any calculations of overtime. Although Appellants assert that some of their arguments do not depend on a finding that the Flexible Benefits Program is not bona fide, their arguments all rest on the assumption that the "opt-out fee" (the difference between the Flex Credit and the cash payout) should have been included in the employee's overtime.

In support of these arguments, Appellants grasp for support from unrelated provisions of the Department of Labor's interpretive guidance. Appellants assert that the Flex Credit is a "wage," despite the fact that "wages" are limited to cash and "facilities," as defined, and the Flex Credit, which is a benefit, is neither. Further, Appellants claim that the full Flex Credit should be included in their overtime calculation on the grounds that it is not voluntary. This is simply not the case; they could have waived participation in the Flexile Benefit Program. An employee has to make a choice to participate in the Flexible Benefit Program, and

then to make another choice to opt-out of medical insurance coverage. Appellants have made these choices because those choices result in a cash payout, and now they seek to break the entire system because they would prefer a bigger payout.

## V. STANDARD OF REVIEW

The Court of Appeal reviews "a district court's grant of summary judgment de novo, and may affirm on any basis supported by the record." *Cadena v. Customer Connexx* LLC, 51 F.4th 831, 835 (9th Cir. 2022) quoting *Gordon v. Virtumundo, Inc*., 575 F.3d 1040, 1047 (9th Cir. 2009). In considering the appeal of a district court's disposition of cross motions for summary judgment, the appellate court views the evidence for each of the motions "in the light most favorable to the nonmoving party" for that motion and determine "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 719 (9th Cir. 2022); *Lake Wash. Sch. Dist*., 947 F.3d at 621, 625 (9th Cir. 2020) (quoting *Wallis v. Princess Cruises, Inc*., 306 F.3d 827, 832 (9th Cir. 2002)).

## VI. ARGUMENT

### A. BECAUSE THE COUNTY'S FLEXIBLE BENEFITS PROGRAM IS BONA FIDE, NON-CASH CONTRIBUTIONS TO THE PLAN ARE PROPERLY EXCLUDED FROM THE FLSA REGULAR RATE OF PAY

#### 1. The District Court Was Correct That the Bona Fide Status of the Flexible Benefits Program is Dispositive

The crux of Appellants' opening brief is that the District Court erred in ruling that "all of Plaintiffs' claims 'rise and fall with the determination of whether or not the plan is bona fide.'" The District Court was precisely correct.

Appellants assert that the County has underpaid them overtime because only cash payments which Plaintiffs elected under the County's Flexible Benefits Program, and not the full value of the "flex credit" they may use to purchase health insurance, are included in the regular rate of pay. The FLSA requires that all remuneration to employees be included in the regular rate of pay unless the remuneration falls within an enumerated exclusion. 29 U.S.C. § 207(e).

Appellee contends, and the District Court correctly found, that the County's contributions to the Flexible Benefits Program fall within such an exclusion. 29 U.S.C § 207(e)(4) provides that "contributions irrevocably made by an employer to a trustee or third-person pursuant to a bona fide plan for providing old-age, retirement, life, accidental, or health insurance or similar benefits" are excluded from the regular rate of pay for FLSA overtime purposes. If the District Court is correct that the Flexible Benefits Program is a bona fide plan, the County's contributions to that plan are excluded from the regular rate. If the Flexible Benefits Program contributions are excluded from the regular rate, Appellants have been paid all of the FLSA overtime they are owed.

Contrary to Appellants' assertion, the finding that the Flexible Benefits Program is bona fide, and that contributions are therefore properly excluded from the regular rate of pay, disposes of their other, more innovative, arguments, as discussed in greater detail below.

### 2. The Flexible Benefits Plan is Bona Fide

#### a. The Plan is Bona Fide Under the Plain Meaning of the Language of the Act

In order for a benefit plan to qualify for the § 207(e)(4) exclusion, the statute does not require the benefit plan to meet any particular numerical thresholds. Instead, it requires only that a plan be "bona fide."

10293367.6 VE306-011

In construing statutory provisions, courts "first look to the language of the statute to determine whether it has a plain meaning." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir.2009) (citation omitted). Courts should presume that the "legislature says in a statute what it means and means in a statute what it says there." *Id*. (internal citations and quotations omitted). "Thus, [a court's] inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *Id*. (internal citations and quotations omitted).

The Ninth Circuit has previously addressed the plain meaning of "bona fide." In a trademark case, it stated, "'Bona fide use' is not defined in the Lanham Act. The plain meaning of bona fide use is use that is genuine, sincere and carried out in good faith." *Social Technologies LLC v. Apple, Inc.* 4 F.4th 811, 819 n. 8 (9th Cir. 2021) citing Bona Fide, Black's Law Dictionary (11th ed. 2019) and *Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 936 n.3 (9th Cir. 2006). The plain meaning of the statute, therefore, requires only that the employer have established the cafeteria plan in good faith. The true purpose of the plan must be to provide for health insurance or similar benefits; if the purpose of the plan is to mask wages and evade the employer's FLSA overtime obligations, the plan is not bona fide.

The County's Flexible Benefits Program is a cafeteria plan under Section 125 of the Internal Revenue Code for the provision of health insurance and other benefits. (5-ER-913 at ¶ 3.) The primary purpose of the Plan is to systematically provide for health benefits to employees, and the County determines both the targeted amount of the Flex Credit and the opt-out fee based on formulas incorporating actuarial assumptions. Appellants have not alleged that the Flex Benefit Plan is not truly intended to provide employees with benefits, nor would the evidence support such an allegation.

### b. The Department of Labor's Interpretive Guidance Supports a Conclusion the Plan is Bona Fide

Appellants incorrectly interpret the Department of Labor's ("DOL") interpretive guidance at 29 C.F.R. § 778.215 to mean that the plan is not bona fide because it gives the employee the right to receive part of the Flex Credit in cash. Even if the Court finds the DOL guidance of section 778.215 persuasive, that DOL guidance specifically provides at subdivision (a)(5) that a plan does not lose its incidental status by allowing employees to take an incidental amount of cash.

This Circuit, in *Flores v. City of San Gabriel*, 824 F.3d 890 (9th Cir. 2016), in interpreting a prior version of section 778.215, declined to specify precisely what constituted "incidental" cash, but held that direct cash payments to employees that exceeded 40% of the city's total contributions to the plan could not be viewed as incidental.

The percentages paid in cash in this case – uniformly under 20% of the total allotment– are less than half than the amounts in *Flores*. Likewise, the Central District of California's well-reasoned decision in *In re Redondo Beach FLSA Litigation*, Case No.2:17-CV-09097-ODW (SKx), 2019 WL 6310264 noted:

> In this case, the parties do not dispute that the City's direct cash-in-lieu payments constitute between 13.63% and 22.49% of its total contributions, depending on the year. Even considering each year individually, the direct cash-in-lieu payments are not more than incidental to the total contributions for that year. Plaintiffs focus on 2017 and 2018 as exceeding 20% and argue that the City's plan consequently cannot be bona fide in those years. However, the court in Flores unambiguously rejected this precise bright line rule. Further, unlike Flores where the direct payments comprised 42%-46% of the total contributions each year, here direct payments to employees were half that, hovering around or below 20%. Thus, benefit payments to the plan here constitute between 77% and 86% of all contributions for each year at issue. This balance indicates the cash payments were merely an incidental part of the City's benefits plan.

(*Id.* at *5.) (Emphasis in original.)

Further, to the extent this Circuit's decision in *Flores* placed even a

conceptual limit on what constitutes an "incidental" amount of cash, it did so under the constraints of the "narrow reading" doctrine. ("[I]n light of the command that we interpret the FLSA's exemptions narrowly in favor of the employee, we conclude that the City has failed to carry its burden to demonstrate that its cash-in-lieu benefits payments 'plainly and unmistakably' constitute excludable payments under § 207(e)(2)." (Id. at 900.)  Two years after *Flores* was decided, the Supreme Court struck down the narrow reading doctrine, holding instead that the FLSA statutory text must be given a "fair reading" rather than a narrow reading because the FLSA's exemptions are "as much a part of the FLSA's purpose as the [minimum wage and] overtime-pay requirement[s]."  (*Encino Motorcars, LLC v. Navarro* 138 S. Ct. 1134, 1142 (2018).)

> **c.** **This Court is Not Bound by the DOL's Interpretive Guidance**

Even if the Court were to credit Appellants' erroneous interpretation of the DOL's guidance, that guidance at 29 C.F.R. § 778.215(a)(5) does not carry the force of law.  It is a mere agency interpretation, not entitled to the weight of a statute, a published case, or even a regulation promulgated pursuant to notice-and-comment rulemaking.  See *Flores v. City of San Gabriel*, 824 F.3d 890, 899, n.1, (9th Cir. 2016).  It is an interpretive bulletin that is only "entitled to respect" under *Skidmore* to the extent it has the "power to persuade."  (Id. citing *Christensen v. Harris County* (2000) 529 U.S. 576, 587; *Skidmore v. Swift* & Co. (1944) 323 U.S. 134, 140.)  As the Third Circuit explained, "[t]o grant Chevron deference to informal agency interpretations would unduly validate the results of an informal process."  (*Madison v. Res. For Human Dev.* 233 F.3d 175, 185, 186 (3d Cir. 2000).)

As this Circuit noted in *Flores*:

. . . § 778.215 is an interpretative bulletin accorded respect under

*Skidmore* to the extent that the interpretation has the "power to persuade." *Christensen*, 529 U.S. at 587 (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161). Because neither party challenges the district court's reliance on § 778.215 to determine whether the City's payments to a third party may be excluded under § 207(e)(4), we apply § 778.215 here without expressing an opinion as to its persuasiveness.

(Id. at 902, n. 2) (Emphasis added.)

*Skidmore* dictates that "the weight of [an agency's interpretation] in a particular case will depend on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade[.]" (Id. at 140.) Section 778.215(a)(1), at least as interpreted by Appellants to impose a strict limit of 20%, is unpersuasive.

Section 778.215(a)(1) embodies the Department of Labor's opinion that, for the exclusion to apply, any cash payouts must be "incidental." This language, understood to have its plain meaning, dovetails neatly with the statute's requirement that the plan be "bona fide." Cash payments are incidental, as that term is commonly understood, if they accompany, but are secondary to the plan's true purpose of providing benefits. Imposing a rigid percentage threshold shifts the analysis from the Congressionally-defined focus on the purpose of the plan to a factor that the employer does not control. It is illogical to suggest that a plan that is genuinely, for the purpose of providing benefits to employees, *i.e.* bona fide, when 19.9% of the total contributions are paid out in cash, but then somehow loses that status, creating a massive liability to the employer, if a handful of employees opt out of the benefits the next year and push the cash payments to 20.1%.

Appellants do not assert that the County's Flexible Benefits Program is not truly for the purpose of providing benefits to employees, but instead is designed to circumvent the FLSA by masking some wages as faux benefits. And such an assertion would have no support in the evidence.

- 23 -

> **d.** **Because Section 778.215(a)(1) is Not a Regulation, DOL's "Final Rule" Interpreting it is Not Entitled to *Auer* Deference**

Appellants argue that the DOL's 2019 guidance "Regular Rate Under the Fair Labor Standards Act" (the "Final Rule") is entitled to deference under *Auer v. Robbins* 519 U.S. 452, 461(1997), as an agency's interpretation of its own ambiguous regulation. This is incorrect; the Final Rule is an interpretation of an *interpretative guidance*, not of a regulation adopted pursuant to formal rulemaking, and therefore *Auer* and its progeny are inapplicable. *Auer* deference holds that the agency's interpretation of its own ambiguous regulation is "of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Goffney v. Becerra* 995 F.3d 737 (9th Cir. 2021) citing *Bowles v. Seminole Rock & Sand. Co.* 325 U.S. 410, 414 (1945). Even Section 778.215(a) itself is not entitled to that degree of deference; as noted above, its weight is limited to its ability to persuade. The Final Rule expresses the Wage and Hour Division's view of the Department's interpretive guidance at section 778.215, but the Court is not bound by either of those; the Act simply requires that the plan be bona fide, which it plainly is.

Further still, even if an agency's interpretation of its own interpretation could be granted *Auer* deference, section 778.215(a) is not sufficiently ambiguous for the doctrine to apply. A court "may not 'wave the ambiguity flag' and abandon its interpretative efforts simply because he regulation appears 'impenetrable on first read' or 'make[s] the eyes glaze over." *Goffney v. Becerra* 995 F.3d 737 (9th Cir. 2021) quoting *Kisor v. Wilkie* 139 S.Ct. 2400, 2415 (2019).

> **e.** **Appellants' Calculation of the Amount Paid in Cash is Based on a False Assumption**

The evidence demonstrates that the overwhelming bulk of the funds allocated to the Flexible Benefits Program – 91.64% to 95.70% – are spent on

health benefits.  (5-ER-926-928 at ¶¶ 11-17.)  The opt-out fees for DSA members account for 5.55% to 13.58% of the Flexible Credit allocation for those employees and the opt-out fees for PFA members account for 7.99% to 11.37% of that Flex Credit allocation.  (5-ER-919-920 at ¶ 28; 5-ER-1060; SER193-SER198; 6-ER-1121-122 at 27:16-28:2; 6-ER-1123 at 29:6-18.)  The opt-out fee, taken from the Flex Credit allotted to employees, is transferred to the Unions or insurers to make health insurance affordable for the other employees who choose to purchase health insurance.  (3-ER-325-328 at 43:16-9; 3-ER-279 at 20:3-17; 3-ER-280 at 21:15-20; 3-ER-408-410, 414, 421-426 at Nos. 3, 4, 5, 11, 18, 19, 21, 22, 24, and 26; 3-ER-450 at ¶ 15; 3-ER-486 at ¶ 13; 3-ER-305-306 at 19:24-20:24; 3-ER-313-317 at 31:8-35:4; 5-ER-978; 5-ER-918-919 at ¶ 23; 3-ER-281-287 at 38:24-44:22; 3-ER-290-291 at 57:3-58:1; 3-ER-316-328 at 34:24-46:9; 3-ER-452 at ¶ 29; 3-ER-487 at ¶ 24.)  Employees in the Flexible Benefits Program who opt-out of health insurance receive the remainder of the Flex Credit in cash after the opt-out fee is deducted, or that these cash payments to employees account for 2.18% to 19.15% of the total Flex Credit funds for DSA members, and 2.7% to 13.74% for PFA members.  (5-ER-926-928 at ¶¶ 11-17, 5-ER-928-929 at ¶¶ 18-24.)

Appellants assert that employees who voluntarily participated in the County's Flexible Benefits Program, and then opted out of health insurance, received cash compensation in the range of 20.2% to 27.30%.  (3-ER-372-373 at 22:19-23:16; 3-ER-376 at 33:11-23; 3-ER-377 at 36:4-25; SER289-SER417; 3-ER-425-426 at Nos. 24, 26; 3-ER-452 at ¶¶ 30-33; 3-ER-488 at ¶ 28; 3-ER-530 at ¶¶ 15-16.)  To arrive at these figures, Appellants define "cash" compensation to include not only cash actually paid to the opt-out employees, but also amounts that were never paid out to those employees, but instead were irrevocably paid by the County to Unions or to a health insurer to reduce the cost of health insurance premiums paid by other employees.  Appellants argue, without citation to any

authority, that the opt-out fees, which were never paid out to any employee, should nonetheless be regarded as cash compensation paid to employees for the purpose of assessing whether the amount of cash paid out is incidental.  Nothing in *Flores* can be read to suggest that anything other than cash paid to an employee can be considered in determining whether the cash-in-lieu payment is incidental. Appellants' argument is illogical – the opt-out fee amount is simply not cash paid out to employees.  The purpose of testing whether the amount paid out in cash is incidental is to ensure that the plan is bona fide; i.e., truly for the purpose of providing benefits, rather than a scheme for paying additional compensation to employees.  Counting dollars actually spent ***on benefits*** as cash-in-lieu is diametrically opposed to this purpose.

### 3.  The Bona Fide Status of the Plan Must Be Determined on a Plan-Wide Basis

Appellants argue that even if the plan is bona fide, contributions made to the plan for the provision of health insurance benefits are only excluded from the regular rate of pay under section 207 (e)(4) if the health insurance is being provided to that particular employee.  That interpretation flies in the face of the statutory language itself, which states: "As used in this section, the 'regular rate' at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of the employee, but shall not be deemed to include . . .(e)(4)  contributions . . . pursuant to a bona fide plan for . . . health insurance or similar benefits for employees."   (Emphasis added.)  Section 207(e)(4) is concerned with whether the plan as a whole is bona fide, not with the results of any individual employee's choices.

This Circuit's decision in *Flores v. City of San Gabriel*, 824 F.3d 890, 902–3 (9th Cir. 2016) affirmed that the assessment of whether a plan is bona fide is made on a plan-wide basis, and not a per-employee basis: ("[B]ecause section 7(e) of the

FLSA provides for the exclusion of employer contributions for benefits that are made pursuant to a bona fide plan, on further review we believe that the focus of the question should be whether the plan as a whole is a bona fide benefits plan."]) If Congress intended to only exclude contributions made for the particular employee's health insurance, it could have done so.

Further, Appellants' brief misleadingly truncates 29 C.F.R. § 778.215(a)(3)(ii) to assert that the interpretive guidance requires that the interpretation depends on an individualized assessment of each employee. (Opening brief at 36.) Read in context, this provision provides Appellants with no support. Subdivision (a)(3)(ii) describes one of three ways that a plan may comply with § 778.215(a)(3). One of the other ways, subdivision (a)(3)(i), provides that the benefits may "be specified or definitely determinable on an actuarial basis." (Id.) Further, the full sentence that Appellants partially quote states, "[t]here must be both a definite formula for determining the amount to be contributed by the employer and a definite formula for determining the benefits for each of the employees participating in the plan[.]" The guidance does not demand that the *benefits* provided to any particular employee be taken into account, but rather that a formula be used.

### 4.  Contributions to the Plan for the Purchase of Medical Insurance are not Cash Under *Flores*

Appellants significantly misinterpret this Circuit's opinion in *Flores v. City of San Gabriel.* 824 F.3d 890 (2016). *Flores* holds that cash – actual cash – paid out to employees in lieu of medical benefits must be included in the employee's regular rate of pay for FLSA purposes. Appellants do not claim that the County fails to include the cash payouts to employees who opt out of health insurance in their regular rate. (5-ER-937 at ¶ 3; 6-ER-1163 at 36:16-25; 6-ER-1165 at 59:12-24; 4-ER-783.)

Appellants' misinterpretation – that the entire Flex Credit is "cash in lieu" and must be included in the regular rate – finds no support in *Flores*. The decision in *Flores* required the employer to pay the full value of the cafeteria plan credit to employees not because it was all "cash in lieu" but because more than forty percent of the total plan contributions were paid out in cash, which was more than an incidental amount and therefore the plan was not bona fide. Contrary to their assertion in this court, Appellants recognized the distinction between funds spent on health insurance and funds paid out in cash in lieu of purchasing health insurance in support of their Motion for Partial Summary Judgment below: "Plaintiffs can elect to use all or a portion of the Flexible Benefit Allowance to purchase health insurance through their Union and/or to receive cash-in-lieu." (5-ER-920 at ¶ 31; SER289-SER417.)

**B.** **APPELLANTS' ARGUMENTS PREMISED ON THE OPT-OUT FEE BEING CONSIDERED A WAGE ARE MISTAKEN**

**1.** **Appellants' reliance on the County's pay stubs is misplaced**

Appellants assert that the Flex Credit must be "wages" under the FLSA because it is included under the heading "Earnings" on the pay stub, but this is not so. The FLSA does not require a pay stub,[3] pay stub headings are not relevant under the FLSA, and the "Earnings" section of the County's pay stub is based on Internal Revenue Code requirements, not FLSA regular rate requirements.

_____

[3] The DOL's online Frequently Asked Questions page for the FLSA states, "The FLSA does require that employers keep accurate records of hours worked and wages to employees. However, the FLSA does not require an employer to provide employees pay stubs." (https://www.dol.gov/agencies/whd/flsa/faq#:~:text=Are%20pay%20stubs%20required%3F,to%20provide%20employees%20pay%20stubs.)

The "Earnings" section of the County's pay stub corresponds to Internal Revenue Code section 61's definition of gross income, which includes, "Compensation for services, including fees, commissions, fringe benefits, and similar items." This definition of gross income differs significantly from the definition of the "regular rate" under the FLSA. Multiple items that are included in gross income for federal income tax purposes are not required to be included in the regular rate of pay for FLSA purpose, and the Flex Credit is no different. For example, "premiums" for meal and rest period penalties are taxable under the Internal Revenue Code, but are not included in the regular rate. (Compare IRS letter INFO 2005-0094 ["the additional hour of pay an employer must pay to an employee for failure to give the employee the required meal periods or rest periods is wages for purposes of the FICA, FUTA and income tax withholding provisions of the [Internal Revenue] Code"] with *Rubin v. Wal-Mart Stores*, 599 F. Supp.2d 1176, 1178-1179 (2009) ["Courts and agencies interpreting the overtime and meal-period laws have uniformly concluded that meal period premiums are not included in the overtime rate."]

## 1. Since The Opt-Out Fee Is Not A Wage, It Cannot Be an Unlawful Kick-Back of Wages

Appellants argue that the opt-out fee constitutes an unlawful "kick-back" pursuant to the Department of Labor's interpretive guidance at 29 C.F.R. § 531.35. Because the Flex Credit is not a "wage," the opt-out fee is not and cannot be a "kickback" of wages earned.

Section 531.35 provides that "[w]hether in cash or facilities, 'wages' cannot be considered to have been paid to the employer and received by the employee unless they are paid finally and unconditionally or 'free and clear.'" The regulation, which underscores with quotation marks that it using "wages" precisely, is clear on its face that this term refers to cash and facilities.

29 C.F.R. § 531.32(a) provides a detailed listing of the types of items that are "facilities" for purposes of this analysis:

> "Other facilities," as used in this section, must be something like board or lodging. The following items have been deemed to be within the meaning of the term: Meals furnished at company restaurants or cafeterias or by hospital, hotels, or restaurants to their employees; meals, dormitory rooms, and tuition furnished by a college to its student employees; housing furnished for dwelling purposes; general merchandise furnished at company stores and commissaries (including articles of food, clothing, and household effects); fuel (including coal, kerosene, firewood, and lumber slabs), electricity, water, and gas furnished for the noncommercial personal use of the employee; transportation furnished employees between their homes and work where the travel time does not constitute hours worked compensable under the Act and the transportation is not an incident of and necessary to the employment.

The Flex Credit, from which the opt-out fee is deducted, is neither a wage nor a facility. It is a benefit, provided by the County, allowing participants in the Program to choose their medical insurance. The amount of the Flex Credit is the same for all employees who choose to participate in the Flexible Benefits Program, regardless of their wage. (6-ER-1189-1190 at 31:4-32:21; 5-ER-915 at ¶ 10.))

## 2. DOL Guidance on Deductions From Stipulated Wages Is Not Relevant to the Opt-Out Fee From a Flexible Benefits Program.

Likewise, Appellants misinterpret the Department of Labor's interpretive guidance to assert that the County's "exclusion of the opt-out fee deduction in calculating the regular rate violated the Department of Labor's interpretive guidance at 29 C.F.R. § 531.37(b), which mandates that the regular rate be calculated prior to deductions being taken." (Appellants' brief at 13.)

Section 531.37 is entirely inapplicable. On its face, this guidance pertains to employees who receive all or some of their wages in "facilities" such as board or lodging, and prohibits deduction for expenses such as "tools or other articles which are not 'facilities' within the meaning of the Act." This guidance contemplates a

"stipulated wage" from which facilities such as lodging are deducted. This has no application to the County's Flexible Benefits Program.

### 3. The Opt-Out Fee, Like Participation in the Flexible Benefits Program Altogether, is Voluntary

Appellants argue that the opt-out fee must be included in the regular rate because it is not voluntary. Even if the opt-out fee were somehow to be construed as a "deduction" from Appellants' wages, the evidence demonstrates it is clearly voluntary, and therefore allowable.

Appellants are not required to enroll in the Flexible Benefits Program; they have the ability to waive participation entirely, as some County employees do. (5-ER-926 at ¶ 11.) Employees also have the choice of doing nothing and being enrolled in the County's lowest cost medical benefits plan. (5-ER-975; 2-ER-125 at ¶ 6.) Appellants here have made a conscious choice to enroll in the Flexible Benefits Program, and then opt-out of health insurance. Appellants who opted out made this choice on an individual basis, not through their unions. The fact that opting out resulted in a reduction of the Flex Credit by the amount of the opt-out fee was clearly explained to Appellants before they opted out. For example, the County's Benefits Plan Handbook states, "[i]f you opt-out of medical plan coverage, a portion of your County Flexible Credit Allowance is allocated to the Medical Internal Service Fund (ISF) as your portion of administrative costs of the program and the general risk pool. . . . You can use the remaining Flexible Credits to pay for other Flexible Benefits Programs, or you may elect to receive them as cash back in your paycheck." (5-ER-978.) The opt-out fee is determined and disclosed to participants prior to open enrollment and Appellants' election to opt out – in fact, the amount is listed on the enrollment form itself. (2-ER-135-161; 2-ER-163-174.)

10293367.6 VE306-011

This was a rational and informed choice by Appellants who opted out: all they had to do was check a box, and for this act they get extra money, even if a small sum, in every paycheck. It is, quite simply, a windfall. Appellants now believe they do not receive *enough* of a windfall for checking the opt-out box, but they cannot credibly claim that they did not voluntarily agree to the opt-out fee.

## VII. <u>CONCLUSION</u>

For the foregoing reasons, the Court should affirm the District Court's grant of the County's Motion for Summary Judgment and denial of the Appellants' Motion for Partial Summary Judgment.

Dated: December 16, 2022          LIEBERT CASSIDY WHITMORE


By:    */s/ Paul D. Knothe*
        Brian P. Walter
        Paul D. Knothe
        Attorneys for Appellee/Defendant
        County of Ventura

10293367.6 VE306-011

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** No. 22-55663

I am the attorney or self-represented party.

**This brief contains** 10,396 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [        ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Paul D. Knothe   **Date** December 16, 2022

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*

**ADDENDUM**

# INDEX TO ADDENDUM

# PERTINENT STATUTORY AND CONSTITUTIONAL AUTHORITIES

29 U.S.C.A. § 207…………………………………………………………...A-1

29 C.F.R. § 531.32………………………………………………..……………A-12

29 C.F.R. § 531.35………………………………………………..…………A-14

29 C.F.R. § 531.37…………………………………………….…………A-15

29 C.F.R. § 778.215…… ……………………………………………….…….A-17

Questions and Answers About the Fair Labor Standards Act (FLSA)………...A-20

⚑ KeyCite Yellow Flag - Negative Treatment

Unconstitutional or PreemptedNegative Treatment Reconsidered by Florida ex rel. Atty. Gen. v. U.S. Dept. of Health and Human Services, 11th Cir.(Fla.), Aug. 12, 2011

⚑ KeyCite Yellow Flag - Negative TreatmentProposed Legislation

United States Code Annotated
   Title 29. Labor
      Chapter 8. Fair Labor Standards (Refs & Annos)

29 U.S.C.A. § 207

## § 207. Maximum hours

Effective: March 23, 2010

Currentness

**(a) Employees engaged in interstate commerce; additional applicability to employees pursuant to subsequent amendatory provisions**

**(1)** Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

**(2)** No employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, and who in such workweek is brought within the purview of this subsection by the amendments made to this chapter by the Fair Labor Standards Amendments of 1966--

   **(A)** for a workweek longer than forty-four hours during the first year from the effective date of the Fair Labor Standards Amendments of 1966,

   **(B)** for a workweek longer than forty-two hours during the second year from such date, or

   **(C)** for a workweek longer than forty hours after the expiration of the second year from such date,

unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

**(b) Employment pursuant to collective bargaining agreement; employment by independently owned and controlled local enterprise engaged in distribution of petroleum products**

No employer shall be deemed to have violated subsection (a) by employing any employee for a workweek in excess of that specified in such subsection without paying the compensation for overtime employment prescribed therein if such employee is so employed--

**(1)** in pursuance of an agreement, made as a result of collective bargaining by representatives of employees certified as bona fide by the National Labor Relations Board, which provides that no employee shall be employed more than one thousand and forty hours during any period of twenty-six consecutive weeks; or

**(2)** in pursuance of an agreement, made as a result of collective bargaining by representatives of employees certified as bona fide by the National Labor Relations Board, which provides that during a specified period of fifty-two consecutive weeks the employee shall be employed not more than two thousand two hundred and forty hours and shall be guaranteed not less than one thousand eight hundred and forty-hours (or not less than forty-six weeks at the normal number of hours worked per week, but not less than thirty hours per week) and not more than two thousand and eighty hours of employment for which he shall receive compensation for all hours guaranteed or worked at rates not less than those applicable under the agreement to the work performed and for all hours in excess of the guaranty which are also in excess of the maximum workweek applicable to such employee under subsection (a) or two thousand and eighty in such period at rates not less than one and one-half times the regular rate at which he is employed; or

**(3)** by an independently owned and controlled local enterprise (including an enterprise with more than one bulk storage establishment) engaged in the wholesale or bulk distribution of petroleum products if--

**(A)** the annual gross volume of sales of such enterprise is less than $1,000,000 exclusive of excise taxes,

**(B)** more than 75 per centum of such enterprise's annual dollar volume of sales is made within the State in which such enterprise is located, and

**(C)** not more than 25 per centum of the annual dollar volume of sales of such enterprise is to customers who are engaged in the bulk distribution of such products for resale,

and such employee receives compensation for employment in excess of forty hours in any workweek at a rate not less than one and one-half times the minimum wage rate applicable to him under section 206 of this title,

and if such employee receives compensation for employment in excess of twelve hours in any workday, or for employment in excess of fifty-six hours in any workweek, as the case may be, at a rate not less than one and one-half times the regular rate at which he is employed.

**(c), (d)** Repealed. Pub.L. 93-259, § 19(e), Apr. 8, 1974, 88 Stat. 66

## (e) "Regular rate" defined

As used in this section the "regular rate" at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee, but shall not be deemed to include--

**(1)** sums paid as gifts; payments in the nature of gifts made at Christmas time or on other special occasions, as a reward for service, the amounts of which are not measured by or dependent on hours worked, production, or efficiency;

**(2)** payments made for occasional periods when no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause; reasonable payments for traveling expenses, or other expenses, incurred by an employee in the furtherance of his employer's interests and properly reimbursable by the employer; and other similar payments to an employee which are not made as compensation for his hours of employment;

**(3)** Sums[1] paid in recognition of services performed during a given period if either, (a) both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly; or (b) the payments are made pursuant to a bona fide profit-sharing plan or trust or bona fide thrift or savings plan, meeting the requirements of the Administrator set forth in appropriate regulations which he shall issue, having due regard among other relevant factors, to the extent to which the amounts paid to the employee are determined without regard to hours of work, production, or efficiency; or (c) the payments are talent fees (as such talent fees are defined and delimited by regulations of the Administrator) paid to performers, including announcers, on radio and television programs;

**(4)** contributions irrevocably made by an employer to a trustee or third person pursuant to a bona fide plan for providing old-age, retirement, life, accident, or health insurance or similar benefits for employees;

**(5)** extra compensation provided by a premium rate paid for certain hours worked by the employee in any day or workweek because such hours are hours worked in excess of eight in a day or in excess of the maximum workweek applicable to such employee under subsection (a) or in excess of the employee's normal working hours or regular working hours, as the case may be;

**(6)** extra compensation provided by a premium rate paid for work by the employee on Saturdays, Sundays, holidays, or regular days of rest, or on the sixth or seventh day of the workweek, where such premium rate is not less than one and one-half times the rate established in good faith for like work performed in nonovertime hours on other days;

**(7)** extra compensation provided by a premium rate paid to the employee, in pursuance of an applicable employment contract or collective-bargaining agreement, for work outside of the hours established in good faith by the contract or agreement as the basic, normal, or regular workday (not exceeding eight hours) or workweek (not exceeding the maximum workweek applicable to such employee under subsection (a),[2] where such premium rate is not less than one and one-half times the rate established in good faith by the contract or agreement for like work performed during such workday or workweek; or

**(8)** any value or income derived from employer-provided grants or rights provided pursuant to a stock option, stock appreciation right, or bona fide employee stock purchase program which is not otherwise excludable under any of paragraphs (1) through (7) if--

**(A)** grants are made pursuant to a program, the terms and conditions of which are communicated to participating employees either at the beginning of the employee's participation in the program or at the time of the grant;

**(B)** in the case of stock options and stock appreciation rights, the grant or right cannot be exercisable for a period of at least 6 months after the time of grant (except that grants or rights may become exercisable because of an employee's death, disability, retirement, or a change in corporate ownership, or other circumstances permitted by regulation), and the exercise price is at least 85 percent of the fair market value of the stock at the time of grant;

**(C)** exercise of any grant or right is voluntary; and

**(D)** any determinations regarding the award of, and the amount of, employer-provided grants or rights that are based on performance are--

**(i)** made based upon meeting previously established performance criteria (which may include hours of work, efficiency, or productivity) of any business unit consisting of at least 10 employees or of a facility, except that, any determinations may be based on length of service or minimum schedule of hours or days of work; or

**(ii)** made based upon the past performance (which may include any criteria) of one or more employees in a given period so long as the determination is in the sole discretion of the employer and not pursuant to any prior contract.

**(f) Employment necessitating irregular hours of work**

No employer shall be deemed to have violated subsection (a) by employing any employee for a workweek in excess of the maximum workweek applicable to such employee under subsection (a) if such employee is employed pursuant to a bona fide individual contract, or pursuant to an agreement made as a result of collective bargaining by representatives of employees, if the duties of such employee necessitate irregular hours of work, and the contract or agreement (1) specifies a regular rate of pay of not less than the minimum hourly rate provided in subsection (a) or (b) of section 206 of this title (whichever may be applicable) and compensation at not less than one and one-half times such rate for all hours worked in excess of such maximum workweek, and (2) provides a weekly guaranty of pay for not more than sixty hours based on the rates so specified.

**(g) Employment at piece rates**

No employer shall be deemed to have violated subsection (a) by employing any employee for a workweek in excess of the maximum workweek applicable to such employee under such subsection if, pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work, the amount paid to the employee for the number of hours worked by him in such workweek in excess of the maximum workweek applicable to such employee under such subsection--

**(1)** in the case of an employee employed at piece rates, is computed at piece rates not less than one and one-half times the bona fide piece rates applicable to the same work when performed during nonovertime hours; or

**(2)** in the case of an employee performing two or more kinds of work for which different hourly or piece rates have been established, is computed at rates not less than one and one-half times such bona fide rates applicable to the same work when performed during nonovertime hours; or

**(3)** is computed at a rate not less than one and one-half times the rate established by such agreement or understanding as the basic rate to be used in computing overtime compensation thereunder: *Provided*, That the rate so established shall be authorized by regulation by the Administrator as being substantially equivalent to the average hourly earnings of the employee, exclusive of overtime premiums, in the particular work over a representative period of time;

and if (i) the employee's average hourly earnings for the workweek exclusive of payments described in paragraphs (1) through (7) of subsection (e) are not less than the minimum hourly rate required by applicable law, and (ii) extra overtime compensation is properly computed and paid on other forms of additional pay required to be included in computing the regular rate.

**(h) Credit toward minimum wage or overtime compensation of amounts excluded from regular rate**

**(1)** Except as provided in paragraph (2), sums excluded from the regular rate pursuant to subsection (e) shall not be creditable toward wages required under section 206 of this title or overtime compensation required under this section.

**(2)** Extra compensation paid as described in paragraphs (5), (6), and (7) of subsection (e) shall be creditable toward overtime compensation payable pursuant to this section.

**(i) Employment by retail or service establishment**

No employer shall be deemed to have violated subsection (a) by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services. In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

**(j) Employment in hospital or establishment engaged in care of sick, aged, or mentally ill**

No employer engaged in the operation of a hospital or an establishment which is an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises shall be deemed to have violated subsection (a) if, pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work, a work period of fourteen consecutive days is accepted in lieu of the workweek of seven consecutive days for purposes of overtime computation and if, for his employment in excess of eight hours in any workday and in excess of eighty hours in such fourteen-day period, the employee receives compensation at a rate not less than one and one-half times the regular rate at which he is employed.

**(k) Employment by public agency engaged in fire protection or law enforcement activities**

No public agency shall be deemed to have violated subsection (a) with respect to the employment of any employee in fire protection activities or any employee in law enforcement activities (including security personnel in correctional institutions) if--

**(1)** in a work period of 28 consecutive days the employee receives for tours of duty which in the aggregate exceed the lesser of (A) 216 hours, or (B) the average number of hours (as determined by the Secretary pursuant to section 6(c)(3) of the Fair Labor Standards Amendments of 1974) in tours of duty of employees engaged in such activities in work periods of 28 consecutive days in calendar year 1975; or

**(2)** in the case of such an employee to whom a work period of at least 7 but less than 28 days applies, in his work period the employee receives for tours of duty which in the aggregate exceed a number of hours which bears the same ratio to the number of consecutive days in his work period as 216 hours (or if lower, the number of hours referred to in clause (B) of paragraph (1)) bears to 28 days,

compensation at a rate not less than one and one-half times the regular rate at which he is employed.

**(l) Employment in domestic service in one or more households**

No employer shall employ any employee in domestic service in one or more households for a workweek longer than forty hours unless such employee receives compensation for such employment in accordance with subsection (a).

**(m) Employment in tobacco industry**

For a period or periods of not more than fourteen workweeks in the aggregate in any calendar year, any employer may employ any employee for a workweek in excess of that specified in subsection (a) without paying the compensation for overtime employment prescribed in such subsection, if such employee--

**(1)** is employed by such employer--

**(A)** to provide services (including stripping and grading) necessary and incidental to the sale at auction of green leaf tobacco of type 11, 12, 13, 14, 21, 22, 23, 24, 31, 35, 36, or 37 (as such types are defined by the Secretary of Agriculture), or in auction sale, buying, handling, stemming, redrying, packing, and storing of such tobacco,

**(B)** in auction sale, buying, handling, sorting, grading, packing, or storing green leaf tobacco of type 32 (as such type is defined by the Secretary of Agriculture), or

**(C)** in auction sale, buying, handling, stripping, sorting, grading, sizing, packing, or stemming prior to packing, of perishable cigar leaf tobacco of type 41, 42, 43, 44, 45, 46, 51, 52, 53, 54, 55, 61, or 62 (as such types are defined by the Secretary of Agriculture); and

**(2)** receives for--

**(A)** such employment by such employer which is in excess of ten hours in any workday, and

**(B)** such employment by such employer which is in excess of forty-eight hours in any workweek,

compensation at a rate not less than one and one-half times the regular rate at which he is employed.

An employer who receives an exemption under this subsection shall not be eligible for any other exemption under this section.

**(n) Employment by street, suburban, or interurban electric railway, or local trolley or motorbus carrier**

In the case of an employee of an employer engaged in the business of operating a street, suburban or interurban electric railway, or local trolley or motorbus carrier (regardless of whether or not such railway or carrier is public or private or operated for profit or not for profit), in determining the hours of employment of such an employee to which the rate prescribed by subsection (a) applies there shall be excluded the hours such employee was employed in charter activities by such employer if (1) the employee's employment in such activities was pursuant to an agreement or understanding with his employer arrived at before engaging in such employment, and (2) if employment in such activities is not part of such employee's regular employment.

**(o) Compensatory time**

**(1)** Employees of a public agency which is a State, a political subdivision of a State, or an interstate governmental agency may receive, in accordance with this subsection and in lieu of overtime compensation, compensatory time off at a rate not less than one and one-half hours for each hour of employment for which overtime compensation is required by this section.

**(2)** A public agency may provide compensatory time under paragraph (1) only--

   **(A)** pursuant to--

      **(i)** applicable provisions of a collective bargaining agreement, memorandum of understanding, or any other agreement between the public agency and representatives of such employees; or

      **(ii)** in the case of employees not covered by subclause (i), an agreement or understanding arrived at between the employer and employee before the performance of the work; and

   **(B)** if the employee has not accrued compensatory time in excess of the limit applicable to the employee prescribed by paragraph (3).

In the case of employees described in clause (A)(ii) hired prior to April 15, 1986, the regular practice in effect on April 15, 1986, with respect to compensatory time off for such employees in lieu of the receipt of overtime compensation, shall constitute an agreement or understanding under such clause (A)(ii). Except as provided in the previous sentence, the provision of compensatory time off to such employees for hours worked after April 14, 1986, shall be in accordance with this subsection.

**(3)(A)** If the work of an employee for which compensatory time may be provided included work in a public safety activity, an emergency response activity, or a seasonal activity, the employee engaged in such work may accrue not more than 480 hours of compensatory time for hours worked after April 15, 1986. If such work was any other work, the employee engaged in such work may accrue not more than 240 hours of compensatory time for hours worked after April 15, 1986. Any such employee

who, after April 15, 1986, has accrued 480 or 240 hours, as the case may be, of compensatory time off shall, for additional overtime hours of work, be paid overtime compensation.

**(B)** If compensation is paid to an employee for accrued compensatory time off, such compensation shall be paid at the regular rate earned by the employee at the time the employee receives such payment.

**(4)** An employee who has accrued compensatory time off authorized to be provided under paragraph (1) shall, upon termination of employment, be paid for the unused compensatory time at a rate of compensation not less than--

    **(A)** the average regular rate received by such employee during the last 3 years of the employee's employment, or

    **(B)** the final regular rate received by such employee,

whichever is higher[3]

**(5)** An employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency--

    **(A)** who has accrued compensatory time off authorized to be provided under paragraph (1), and

    **(B)** who has requested the use of such compensatory time,

shall be permitted by the employee's employer to use such time within a reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency.

**(6)** The hours an employee of a public agency performs court reporting transcript preparation duties shall not be considered as hours worked for the purposes of subsection (a) if--

    **(A)** such employee is paid at a per-page rate which is not less than--

        **(i)** the maximum rate established by State law or local ordinance for the jurisdiction of such public agency,

        **(ii)** the maximum rate otherwise established by a judicial or administrative officer and in effect on July 1, 1995, or

        **(iii)** the rate freely negotiated between the employee and the party requesting the transcript, other than the judge who presided over the proceedings being transcribed, and

    **(B)** the hours spent performing such duties are outside of the hours such employee performs other work (including hours for which the agency requires the employee's attendance) pursuant to the employment relationship with such public agency.

For purposes of this section, the amount paid such employee in accordance with subparagraph (A) for the performance of court reporting transcript preparation duties, shall not be considered in the calculation of the regular rate at which such employee is employed.

**(7)** For purposes of this subsection--

    **(A)** the term "overtime compensation" means the compensation required by subsection (a), and

    **(B)** the terms "compensatory time" and "compensatory time off" mean hours during which an employee is not working, which are not counted as hours worked during the applicable workweek or other work period for purposes of overtime compensation, and for which the employee is compensated at the employee's regular rate.

**(p) Special detail work for fire protection and law enforcement employees; occasional or sporadic employment; substitution**

**(1)** If an individual who is employed by a State, political subdivision of a State, or an interstate governmental agency in fire protection or law enforcement activities (including activities of security personnel in correctional institutions) and who, solely at such individual's option, agrees to be employed on a special detail by a separate or independent employer in fire protection, law enforcement, or related activities, the hours such individual was employed by such separate and independent employer shall be excluded by the public agency employing such individual in the calculation of the hours for which the employee is entitled to overtime compensation under this section if the public agency--

    **(A)** requires that its employees engaged in fire protection, law enforcement, or security activities be hired by a separate and independent employer to perform the special detail,

    **(B)** facilitates the employment of such employees by a separate and independent employer, or

    **(C)** otherwise affects the condition of employment of such employees by a separate and independent employer.

**(2)** If an employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency undertakes, on an occasional or sporadic basis and solely at the employee's option, part-time employment for the public agency which is in a different capacity from any capacity in which the employee is regularly employed with the public agency, the hours such employee was employed in performing the different employment shall be excluded by the public agency in the calculation of the hours for which the employee is entitled to overtime compensation under this section.

**(3)** If an individual who is employed in any capacity by a public agency which is a State, political subdivision of a State, or an interstate governmental agency, agrees, with the approval of the public agency and solely at the option of such individual, to substitute during scheduled work hours for another individual who is employed by such agency in the same capacity, the hours such employee worked as a substitute shall be excluded by the public agency in the calculation of the hours for which the employee is entitled to overtime compensation under this section.

**(q) Maximum hour exemption for employees receiving remedial education**

Any employer may employ any employee for a period or periods of not more than 10 hours in the aggregate in any workweek in excess of the maximum workweek specified in subsection (a) without paying the compensation for overtime employment prescribed in such subsection, if during such period or periods the employee is receiving remedial education that is--

**(1)** provided to employees who lack a high school diploma or educational attainment at the eighth grade level;

**(2)** designed to provide reading and other basic skills at an eighth grade level or below; and

**(3)** does not include job specific training.

**(r) Reasonable break time for nursing mothers**

**(1)** An employer shall provide--

**(A)** a reasonable break time for an employee to express breast milk for her nursing child for 1 year after the child's birth each time such employee has need to express the milk; and

**(B)** a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk.

**(2)** An employer shall not be required to compensate an employee receiving reasonable break time under paragraph (1) for any work time spent for such purpose.

**(3)** An employer that employs less than 50 employees shall not be subject to the requirements of this subsection, if such requirements would impose an undue hardship by causing the employer significant difficulty or expense when considered in relation to the size, financial resources, nature, or structure of the employer's business.

**(4)** Nothing in this subsection shall preempt a State law that provides greater protections to employees than the protections provided for under this subsection.

### CREDIT(S)

(June 25, 1938, c. 676, § 7, 52 Stat. 1063; Oct. 29, 1941, c. 461, 55 Stat. 756; July 20, 1949, c. 352, § 1, 63 Stat. 446; Oct. 26, 1949, c. 736, § 7, 63 Stat. 912; Pub.L. 87-30, § 6, May 5, 1961, 75 Stat. 69; Pub.L. 89-601, Title II, §§ 204(c), (d), 212(b), Title IV, §§ 401 to 403, Sept. 23, 1966, 80 Stat. 835, 837, 841, 842; Pub.L. 93-259, §§ 6(c)(1), 7(b)(2), 9(a), 12(b), 19, 21(a), Apr. 8, 1974, 88 Stat. 60, 62, 64, 66, 68; Pub.L. 99-150, §§ 2(a), 3(a) to (c)(1), Nov. 13, 1985, 99 Stat. 787, 789; Pub.L. 101-157, § 7, Nov. 17, 1989, 103 Stat. 944; Pub.L. 104-26, § 2, Sept. 6, 1995, 109 Stat. 264; Pub.L. 106-202, § 2(a), (b), May 18, 2000, 114 Stat. 308; Pub.L. 111-148, Title IV, § 4207, Mar. 23, 2010, 124 Stat. 577.)

Notes of Decisions (2399)

Footnotes

1   So in original. Probably should not be capitalized.

2   So in original. Probably should have closed parentheses.

3   So in original. Probably should be followed by a period.

29 U.S.C.A. § 207, 29 USCA § 207
Current through P.L. 117-228. Some statute sections may be more current, see credits for details.

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
   Title 29. Labor
      Subtitle B. Regulations Relating to Labor
         Chapter V. Wage and Hour Division, Department of Labor
        Subchapter A. Regulations
           Part 531. Wage Payments Under the Fair Labor Standards Act of 1938 (Refs & Annos)
         Subpart C. Interpretations
           How Payments May be Made

29 C.F.R. § 531.32

§ 531.32 "Other facilities."

Currentness

(a) "Other facilities," as used in this section, must be something like board or lodging. The following items have been deemed to be within the meaning of the term: Meals furnished at company restaurants or cafeterias or by hospitals, hotels, or restaurants to their employees; meals, dormitory rooms, and tuition furnished by a college to its student employees; housing furnished for dwelling purposes; general merchandise furnished at company stores and commissaries (including articles of food, clothing, and household effects); fuel (including coal, kerosene, firewood, and lumber slabs), electricity, water, and gas furnished for the noncommercial personal use of the employee; transportation furnished employees between their homes and work where the travel time does not constitute hours worked compensable under the Act and the transportation is not an incident of and necessary to the employment.

(b) Shares of capital stock in an employer company, representing only a contingent proprietary right to participate in profits and losses or in the assets of the company at some future dissolution date, do not appear to be "facilities" within the meaning of the section.

(c) It should also be noted that under § 531.3(d)(1), the cost of furnishing "facilities" which are primarily for the benefit or convenience of the employer will not be recognized as reasonable and may not therefore be included in computing wages. Items in addition to those set forth in § 531.3 which have been held to be primarily for the benefit or convenience of the employer and are not therefore to be considered "facilities" within the meaning of section 3(m) include: Safety caps, explosives, and miners' lamps (in the mining industry); electric power (used for commercial production in the interest of the employer); company police and guard protection; taxes and insurance on the employer's buildings which are not used for lodgings furnished to the employee; "dues" to chambers of commerce and other organizations used, for example, to repay subsidies given to the employer to locate his factory in a particular community; transportation charges where such transportation is an incident of and necessary to the employment (as in the case of maintenance-of-way employees of a railroad); charges for rental of uniforms where the nature of the business requires the employee to wear a uniform; medical services and hospitalization which the employer is bound to furnish under workmen's compensation acts, or similar Federal, State, or local law. On the other hand, meals are always regarded as primarily for the benefit and convenience of the employee. For a discussion of reimbursement for expenses such as "supper money," "travel expenses," etc., see § 778.217 of this chapter.

SOURCE: 32 FR 13575, Sept. 28, 1967; 76 FR 18854, April 5, 2011; 85 FR 86789, Dec. 30, 2020; 86 FR 11632, Feb. 26, 2021, unless otherwise noted.

AUTHORITY: 29 U.S.C. 203(m) and (t), as amended by sec. 3(m), Pub.L. 75–718, 52 Stat. 1060; sec. 2, Pub.L. 87–30, 75 Stat. 65; sec. 101, sec. 602, Pub.L. 89–601, 80 Stat. 830; sec. 29(B), Pub.L. 93–259, 88 Stat. 55 sec. 3, sec. 15(c), Pub.L. 95–151, 91 Stat 1245; sec. 2105(b), Pub.L. 104–188, 110 Stat 1755; sec. 8102, Pub.L. 110–28, 121 Stat. 112; and sec. 1201, Div. S., Tit. XII, Pub.L. 115–141, 132 Stat. 348.

Notes of Decisions (20)

Current through Dec. 14, 2022, 87 FR 76428. Some sections may be more current. See credits for details.

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works. A-113

Code of Federal Regulations
    Title 29. Labor
        Subtitle B. Regulations Relating to Labor
            Chapter V. Wage and Hour Division, Department of Labor
                Subchapter A. Regulations
                    Part 531. Wage Payments Under the Fair Labor Standards Act of 1938 (Refs & Annos)
                        Subpart C. Interpretations
                            How Payments May be Made

29 C.F.R. § 531.35

§ 531.35 "Free and clear" payment; "kickbacks."

Currentness

Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash. For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act. See also in this connection, § 531.32(c).

SOURCE: 32 FR 13575, Sept. 28, 1967; 76 FR 18854, April 5, 2011; 85 FR 86789, Dec. 30, 2020; 86 FR 11632, Feb. 26, 2021, unless otherwise noted.

AUTHORITY: 29 U.S.C. 203(m) and (t), as amended by sec. 3(m), Pub.L. 75–718, 52 Stat. 1060; sec. 2, Pub.L. 87–30, 75 Stat. 65; sec. 101, sec. 602, Pub.L. 89–601, 80 Stat. 830; sec. 29(B), Pub.L. 93–259, 88 Stat. 55 sec. 3, sec. 15(c), Pub.L. 95–151, 91 Stat 1245; sec. 2105(b), Pub.L. 104–188, 110 Stat 1755; sec. 8102, Pub.L. 110–28, 121 Stat. 112; and sec. 1201, Div. S., Tit. XII, Pub.L. 115–141, 132 Stat. 348.

Notes of Decisions (46)

Current through Dec. 14, 2022, 87 FR 76428. Some sections may be more current. See credits for details.

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 29. Labor
        Subtitle B. Regulations Relating to Labor
            Chapter V. Wage and Hour Division, Department of Labor
                Subchapter A. Regulations
                    Part 531. Wage Payments Under the Fair Labor Standards Act of 1938 (Refs & Annos)
                        Subpart C. Interpretations
                            Payment Where Additions or Deductions Are Involved

29 C.F.R. § 531.37

## § 531.37 Overtime workweeks.

Effective: May 5, 2011

Currentness

(a) Section 7 requires that the employee receive compensation for overtime hours at "a rate of not less than one and one-half times the regular rate at which he is employed." When overtime is worked by an employee who receives the whole or part of his or her wage in facilities and it becomes necessary to determine the portion of wages represented by facilities, all such facilities must be measured by the requirements of section 3(m) and subpart B of this part. It is the Administrator's opinion that deductions may be made, however, on the same basis in an overtime workweek as in nonovertime workweeks (see § 531.36), if their purpose and effect are not to evade the overtime requirements of the Act or other law, providing the amount deducted does not exceed the amount which could be deducted if the employee had only worked the maximum number of straight-time hours during the workweek. Deductions in excess of this amount for such articles as tools or other articles which are not "facilities" within the meaning of the Act are illegal in overtime workweeks as well as in nonovertime workweeks. There is no limit on the amount which may be deducted for "board, lodging, or other facilities" in overtime workweeks (as in workweeks when no overtime is worked), provided that these deductions are made only for the "reasonable cost" of the items furnished. These principles assume a situation where bona fide deductions are made for particular items in accordance with the agreement or understanding of the parties. If the situation is solely one of refusal or failure to pay the full amount of wages required by section 7, these principles have no application. Deductions made only in overtime workweeks, or increases in the prices charged for articles or services during overtime workweeks will be scrutinized to determine whether they are manipulations to evade the overtime requirements of the Act.

(b) Where deductions are made from the stipulated wage of an employee, the regular rate of pay is arrived at on the basis of the stipulated wage before any deductions have been made. Where board, lodging, or other facilities are customarily furnished as additions to a cash wage, the reasonable cost of the facilities to the employer must be considered as part of the employee's regular rate of pay. See Walling v. Alaska Pacific Consolidated Mining Co., 152 F.2d 812 (9th Cir. 1945), cert. denied, 327 U.S. 803.

**Credits**

[76 FR 18855, April 5, 2011]

SOURCE: 32 FR 13575, Sept. 28, 1967; 76 FR 18854, April 5, 2011; 85 FR 86789, Dec. 30, 2020; 86 FR 11632, Feb. 26, 2021, unless otherwise noted.

AUTHORITY: 29 U.S.C. 203(m) and (t), as amended by sec. 3(m), Pub.L. 75–718, 52 Stat. 1060; sec. 2, Pub.L. 87–30, 75 Stat. 65; sec. 101, sec. 602, Pub.L. 89–601, 80 Stat. 830; sec. 29(B), Pub.L. 93–259, 88 Stat. 55 sec. 3, sec. 15(c), Pub.L. 95–151, 91 Stat 1245; sec. 2105(b), Pub.L. 104–188, 110 Stat 1755; sec. 8102, Pub.L. 110–28, 121 Stat. 112; and sec. 1201, Div. S., Tit. XII, Pub.L. 115–141, 132 Stat. 348.

Notes of Decisions (1)

Current through Dec. 14, 2022, 87 FR 76428. Some sections may be more current. See credits for details.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 29. Labor
    Subtitle B. Regulations Relating to Labor
      Chapter V. Wage and Hour Division, Department of Labor
        Subchapter B. Statements of General Policy or Interpretation Not Directly Related to Regulations
          Part 778. Overtime Compensation (Refs & Annos)
            Subpart C. Payments that May be Excluded from the "Regular Rate"
              Bonuses

29 C.F.R. § 778.215

§ 778.215 Conditions for exclusion of benefit-plan contributions under section 7(e)(4).

Effective: January 15, 2020
Currentness

(a) General rules. In order for an employer's contribution to qualify for exclusion from the regular rate under section 7(e)(4) of the Act the following conditions must be met:

(1) The contributions must be made pursuant to a specific plan or program adopted by the employer, or by contract as a result of collective bargaining, and communicated to the employees. This may be either a company-financed plan or an employer-employee contributory plan.

(2) The primary purpose of the plan must be to provide systematically for the payment of benefits to employees on account of death, disability, advanced age, retirement, illness, medical expenses, hospitalization, accident, unemployment, legal services, or other events that could cause significant future financial hardship or expense.

(3) In a plan or trust, either:

(i) The benefits must be specified or definitely determinable on an actuarial basis; or

(ii) There must be both a definite formula for determining the amount to be contributed by the employer and a definite formula for determining the benefits for each of the employees participating in the plan; or

(iii) There must be both a formula for determining the amount to be contributed by the employer and a provision for determining the individual benefits by a method which is consistent with the purposes of the plan or trust under section 7(e)(4) of the Act.

(iv) Note: The requirements in paragraphs (a)(3)(ii) and (iii) of this section for a formula for determining the amount to be contributed by the employer may be met by a formula which requires a specific and substantial minimum contribution and which provides that the employer may add somewhat to that amount within specified limits; provided, however, that there is a reasonable relationship between the specified minimum and maximum contributions. Thus, formulas providing

for a minimum contribution of 10 percent of profits and giving the employer discretion to add to that amount up to 20 percent of profits, or for a minimum contribution of 5 percent of compensation and discretion to increase up to a maximum of 15 percent of compensation, would meet the requirement. However, a plan which provides for insignificant minimum contributions and permits a variation so great that, for all practical purposes, the formula becomes meaningless as a measure of contributions, would not meet the requirements.

(4) The employer's contributions must be paid irrevocably to a trustee or third person pursuant to an insurance agreement, trust or other funded arrangement. The trustee must assume the usual fiduciary responsibilities imposed upon trustees by applicable law. The trust or fund must be set up in such a way that in no event will the employer be able to recapture any of the contributions paid in nor in any way divert the funds to his own use or benefit. (It should also be noted that in the case of joint employer-employee contributory plans, where the employee contributions are not paid over to a third person or to a trustee unaffiliated with the employer, violations of the Act may result if the employee contributions cut into the required minimum or overtime rates. See part 531 of this chapter.) Although an employer's contributions made to a trustee or third person pursuant to a benefit plan must be irrevocably made, this does not prevent return to the employer of sums which he had paid in excess of the contributions actually called for by the plan, as where such excess payments result from error or from the necessity of marking payments to cover the estimated cost of contributions at a time when the exact amount of the necessary contributions under the plan is not yet ascertained. For example, a benefit plan may provide for definite insurance benefits for employees in the event of the happening of a specified contingency such as death, sickness, accident, etc., and may provide that the cost of such definite benefits, either in full or any balance in excess of specified employee contributions, will be borne by the employer. In such a case the return by the insurance company to the employer of sums paid by him in excess of the amount required to provide the benefits which, under the plan, are to be provided through contributions by the employer, will not be deemed a recapture or diversion by the employer of contributions made pursuant to the plan.

(5) The plan must not give an employee the right to assign his benefits under the plan nor the option to receive any part of the employer's contributions in cash instead of the benefits under the plan: *Provided, however,* That if a plan otherwise qualified as a bona fide benefit plan under section 7(e)(4) of the Act, it will still be regarded as a bona fide plan even though it provides, as an incidental part thereof, for the payment to an employee in cash of all or a part of the amount standing to his credit (i) at the time of the severance of the employment relation due to causes other than retirement, disability, or death, or (ii) upon proper termination of the plan, or (iii) during the course of his employment under circumstances specified in the plan and not inconsistent with the general purposes of the plan to provide the benefits described in section 7(e)(4) of the Act.

(b) Plans under sections of the Internal Revenue Code. In the absence of evidence to the contrary, where the benefit plan or trust has been approved by the Internal Revenue Service as satisfying the requirements of section 401(a), 403(a), or 403(b) of the Internal Revenue Code, is otherwise maintained pursuant to a written document that the plan sponsor reasonably believes satisfies the requirements of section 401(a), 403(a), 403(b), 408(k) or 408(p) of the Internal Revenue Code, or is sponsored by a government employer that reasonably believes the plan satisfies the requirements of section 457(b) of the Internal Revenue Code, the plan or trust will be considered to meet the conditions specified in paragraphs (a)(1), (2), (4), and (5) of this section.

**Credits**

[33 FR 986, Jan. 26, 1968, as amended at 46 FR 7312, Jan. 23, 1981; 84 FR 68772, Dec. 16, 2019]

SOURCE: 33 FR 986, Jan. 26, 1968; 56 FR 61101, Nov. 29, 1991; 76 FR 18857, April 5, 2011, unless otherwise noted.

AUTHORITY: 52 Stat. 1060, as amended; 29 U.S.C. 201 et seq. Section 778.200 also issued under Pub.L. 106–202, 114 Stat. 308 (29 U.S.C. 207(e) and (h)).

Notes of Decisions (5)

Current through Dec. 14, 2022, 87 FR 76428. Some sections may be more current. See credits for details.

---

**End of Document**                                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

U.S. DEPARTMENT OF LABOR

**Wage and Hour Division**

# Questions and Answers About the Fair Labor Standards Act (FLSA)

**WAGES, PAY AND BENEFITS**

**When are pay raises required?**

Pay raises are generally a matter of agreement between an employer and employee (or the employee's representative). Pay raises to amounts above the Federal minimum wage are not required by the FLSA.

**Is extra pay required for weekend or night work?**

Extra pay for working weekends or nights is a matter of agreement between the employer and the employee (or the employee's representative). The FLSA does not require extra pay for weekend or night work. However, the FLSA does require that covered, nonexempt workers be paid not less than time and one-half the employee's regular rate for time worked over 40 hours in a workweek.

**How are vacation pay, sick pay, holiday pay computed and when are they due?**

The FLSA does not require payment for time not worked, such as vacations, sick leave or holidays (Federal or otherwise). These benefits are matters of agreement between an employer and an employee (or the employee's representative).

**How is severance calculated and when is it due?**

The FLSA requires payment of at least the minimum wage for all hours worked in a workweek and time and one-half an employee's regular rate for time worked over 40 hours in a workweek. There is no requirement in the FLSA for severance pay. Severance pay is a matter of agreement between an employer and an employee (or the employee's representative).

The Employee Benefits Security Administration (EBSA) may be able to assist an employee who did not receive severance pay required in his or her employment contract.

**When must breaks and meal periods be given?**

The FLSA does not require breaks or meal periods be given to workers. Some states may have requirements for breaks or meal periods. If you work in a state which does not require breaks or meal periods, these benefits are a matter of agreement between the employer and the employee (or the employee's representative).

In general, the FLSA does not require breaks or meal periods be given to workers. However, all employers covered by the FLSA must comply with the Act's break time for nursing mothers provision. Please refer to the Wage and Hour Division's Nursing Mothers website to obtain additional information on this topic. Some states may have additional requirements for breaks or meal periods. If you work in a state which does not require breaks or meal periods, these benefits are a matter of agreement between the employer and the employee (or the employee's representative).

**What must an employer provide to workers who want to express breast milk in the workplace?**

Effective March 23, 2010, employers are required under the FLSA to provide unpaid break time and space for nursing mothers to express breast milk for one year after the child's birth. Where employers already provide compensated breaks, an employee who uses that break time to express milk must be compensated in the same way that other employees are compensated for break time. *See* WHD Fact Sheet # 73, Break Time for Nursing Mothers under FLSA. In addition, the FLSA's general requirement that the employee must be completely relieved from duty or else the time must be compensated as work time applies. *See* WHD Fact Sheet #22, Hours Worked Under FLSA. Please refer to the Wage and Hour Division's Nursing Mothers website to obtain additional information on this topic.

**Are periodic performance evaluations required?**

The FLSA does not require performance evaluations. Performance evaluations are generally a matter of agreement between an employer and employee (or the employee's representative).

**OVERTIME AND WORK HOURS**

**When is overtime due?**

For covered, nonexempt employees, the FLSA requires underline overtime pay at a rate of not less than one and one-half times an employee's regular rate of pay after 40 hours of work in a workweek. Some exceptions to the 40 hours per week standard apply under special circumstances to police officers and fire fighters employed by public agencies and to employees of hospitals and nursing homes.

Some states have also enacted overtime laws. Where an employee is subject to both the state and Federal overtime laws, the employee is entitled to overtime according to the higher standard (i.e., the standard that will provide the higher rate of pay).

**How many hours per day or per week can an employee work?**

The FLSA does not limit the number of hours per day or per week that employees aged 16 years and older can be required to work.

**How many hours is full-time employment? How many hours is part-time employment?**

The FLSA does not define full-time employment or part-time employment. This is a matter generally to be determined by the employer. Whether an employee is considered full-time or part-time does not change the application of the FLSA.

**When can an employee's scheduled hours of work be changed?**

The FLSA has no provisions regarding the scheduling of employees, with the exception of certain child labor provisions. Therefore, an employer may change an employee's work hours without giving prior notice or obtaining the employee's consent (unless otherwise subject to a prior agreement between the employer and employee or the employee's representative).

**When is double time due?**

The FLSA has no requirement for double time pay. This is a matter of agreement between an employer and employee (or the employee's representative).

**Is extra pay required for weekend or night work?**

Extra pay for working weekends or nights is a matter of agreement between the employer and the employee (or the employee's representative). The FLSA does not require extra pay for weekend or night work. However, the FLSA does require that covered, nonexempt workers be paid not less than time and one-half the employee's regular rate for time worked over 40 hours in a workweek.

**RECORDKEEPING AND NOTICES**

**Are pay stubs required?**

The FLSA does require that employers keep accurate records of hours worked and wages paid to employees. However, the FLSA does not require an employer to provide employees pay stubs.

**What notices must be given before an employee is terminated or laid off?**

The FLSA has no requirement for notice to an employee prior to termination or lay-off. In some situations, the WARN Act provides for notice to workers prior to lay-off. Some states may have requirements for employee notification prior to termination or lay-off.

---

<u>Topics</u>    <u>Worker Rights</u>    <u>For Employers</u>    <u>Resources</u>    <u>Interpretive Guidance</u>    <u>State Laws</u>    <u>News</u>

**FEDERAL GOVERNMENT** ⊞    **LABOR DEPARTMENT** ⊞    **WHD PORTALS** ⊞

White House    About DOL    YouthRules!

Coronavirus Resources    Guidance Search    Wage Determinations

Disaster Recovery Assistance    Español

**Wage and Hour Division**    DisasterAssistance.gov    Office of Inspector General

USA.gov    Subscribe to the DOL Newsletter

An agency within the U.S.
Department of Labor

200 Constitution Ave NW
Washington, DC 20210
1-866-4-US-WAGE
1-866-487-9243
www.dol.gov

Notification of EEO Violations    Read the DOL Newsletter

No Fear Act Data                  Emergency Accountability Status Link

U.S. Office of Special Counsel    A to Z Index

Connect With DOL

     

Site Map    |    Important Website Notices    |    Privacy & Security Statement